Argued February 10; reversed May 23; rehearing denied
June 13, 1939

# FINK *v.* PRUDENTIAL INSURANCE CO. OF AMERICA

(90 P. (2d) 762)

Department 1.

*U. T. DeMartini*, of Portland (Brice & DeMartini, of Portland, on the brief), for appellant.

*Zanley Galton*, of Portland (Goldstein & Galton, of Portland, on the brief), for respondent.

ROSSMAN, J. This is an appeal by the defendant from a judgment of the circuit court, based upon the verdict of a jury, and entered in an action which was predicated upon two policies of insurance issued by the defendant each of which designated Conrad Fink as the insured and the plaintiff, who was then Fink's wife, as beneficiary. Although the plaintiff contends that the insured was dead at the time the action was instituted, she presented no direct proof of death, but relied upon a presumption or an inference arising from the insured's alleged disappearance. About five years after the disappearance she obtained a divorce from Fink and later married one Frank Young.

One of the policies is in the denomination of $1,000 and was issued June 26, 1919; the other is in the denomination of $500 and was issued May 21, 1928, about one year before the alleged disappearance. The premium payment due upon the $1,000 policy June 26, 1929, was not paid nor were any subsequent premiums discharged, but that policy was continued in effect, under its extended insurance provision, until August 2, 1930; hence, it was necessary to prove that Fink died not later than August 1, 1930. The $500 policy had not expired when the complaint was filed.

The plaintiff claims that Fink disappeared June 29, 1929, and that since that day his whereabouts have not been known. He was born in Russia February 7, 1890, and was, therefore, thirty-nine years old at the time of his alleged disappearance. This action was instituted May 22, 1937, almost eight years after the purported disappearance. The plaintiff claims that the circumstances warrant a conclusion that Fink died immediately subsequent to June 29, 1929, or, in any event, prior to August 2, 1930. The defendant insists that the circumstances do not indicate that Fink was dead when the complaint was filed. One of its witnesses swore that he saw Fink three times in 1932, and another testified that she saw Fink in the years 1932 and 1934. The defendant also contends that virtually no effort was made by the plaintiff to gain information concerning Fink after his departure from his home.

At the conclusion of all of the evidence the plaintiff, over the defendant's objection, was permitted to amend her complaint. Next, the defendant moved for a directed verdict, which motion was denied. After the verdict had been received the defendant moved for judgment notwithstanding the verdict. This motion was also denied. The three rulings just mentioned are the bases of the three assignments of error.

We shall now give a summary of that part of the evidence which bears upon the motion for a directed verdict. Since we believe that the motion should have been allowed, we deem it proper to make the review somewhat more extensive than economy of space might suggest.

When the plaintiff was nineteen years of age and Fink was twenty-two they were married in their native Russia. Both spoke the German language. Two months

later they sailed for America. In their trek across their adopted land Fink worked at various occupations all of a manual nature. In 1919 the two arrived in Portland where they made their home in a German-Russian neighborhood. In Portland Fink, after having pursued several employments, worked for four or five years in a slaughterhouse. A few months before June of 1929 he left the slaughterhouse and became a night fireman in a Portland sawmill. While working there he left his home at 11:15 p. m. and returned the next morning about 9:00. Saturday, June 29, 1929, he left home at the usual hour but has never returned to it.

The plaintiff contends that Fink was not well at the time of his departure and that this fact, together with the circumstance that the day after his leaving two relatives who were on the same train with him could not find him when they afterwards sought him, authorizes a conclusion that some dire fate must have overtaken him; at any rate, that his death occurred before the expiration of the $1,000 policy August 2, 1930. The following is a review of the evidence presented upon that issue. In March or April, 1927, while Fink was working in the slaughterhouse he was accidentally struck on the head. None of the witnesses saw the accident, but one of them, Frank Portello, testified: "When he was hit it didn't completely knock him out, but he couldn't finish his work. He said he got sick to his stomach and went down to the boiler room. He said, 'Well, here I am.' He said, 'I don't know what happened.'" The witness added that Fink bled from his head, nose and mouth, and that the injury left him with a scar "about an inch long". Portello thought that Fink was in a hospital about eight or ten days before he returned to the plant. Prior to the accident,

according to the witness, Fink "was always a very busy man, a good workman, and seemed to be a homelike man * * * always happy, always see him with a smile on his face," but after the accident "there was a radical change all over him. * * * He always complained of serious headaches, and he ran around there—boy, he didn't know where he was at half the time, and I was kind of afraid that something might happen during his work where he was taking care of the boiler." Portello said that after the accident Fink's face "was peaked and he looked pale, just like he had been through a lot of trouble or something." However, Fink continued to work at the slaughterhouse for about two years after the accident.

Henry Fink, the eldest of the six children born to the couple, was twenty-three years old at the time of the trial (1938) and was, therefore, twelve years old when the accident occurred. He testified that prior to the accident his father was affectionate to the plaintiff and considerate of the children "just like any father would be," but that after the accident "he was more reserved like and never did talk to us like he used to; always kind of shy off; never talked much and always nervous and shaky. * * * After the accident he never was the same." He admitted that he had only a faint recollection of the accident.

The plaintiff, before describing Fink's condition following the slaughterhouse accident, mentioned an injury which she said befell him while he was working in a brickyard in Colorado about fifteen years prior to his disappearance. She made virtually no effort to describe the nature of that injury apart from saying that it affected his kidneys. Although she testified that the

second accident caused the insured to be confined to his bed or in a hospital for two or three weeks, she gave neither the name of the physician who had treated him nor the name of the hospital. Likewise she produced no hospital records or other evidence of medical attention received by him. She mentioned hospital and home in the alternative, leaving it uncertain in which he had received treatment. In a questionnaire entitled Claimant's Statement of Disappearance which bears the plaintiff's signature, she was asked and answered as follows:

"What was the condition of insured's health at the time of disappearance? (A) Said to have kidney trouble.

"State names and addresses of any doctors who attended insured and dates of treatments. (A) Don't know.

"State names and addresses of any clinics or hospitals where insured received treatment and give dates. (A) Don't know."

Those questions had been propounded to her by one of the insurance company's employees named Landry. As a witness, the plaintiff was questioned as follows concerning her conference with Landry:

"Q. Well, did he ask you if your husband had ever been in a sanitarium or hospital or home? A. I told him he was sick and he had the flu and he was in hospitals. I didn't mention the accident that time.

"Q. You didn't mention the accident? A. No, because I didn't remember at that time."

It will be recalled that the plaintiff stated that the slaughterhouse accident occurred in 1927 and that the previous one affecting Fink's kidneys occurred about 1914. In his application for the $500 policy which was

made April 23, 1928, Fink was asked and answered as follows:

"Q. What is the present condition of health of life proposed? A. Good.

"Q. When last sick? Month. Year. A. Never serious.

"Q. Of what disease?. A. None.

"Q. Does any physical or mental defect or infirmity exist? A. No.

"Q. Has life proposed ever suffered from ' * * * disease of the liver or kidneys * * * or accident of any kind? A. None.

"Q. Has life proposed received treatment within the past three years at a dispensary, hospital or sanitarium? If so, state where, when and for what illness. A. No.

"Q. On what dates and for what complaints has life proposed been attended by a physician during the past three years? None."

The application containing the above printed questions and written answers bears Fink's signature. In his application for the $1,000 policy which was signed by Fink June 17, 1919, he was asked and answered as follows:

"Q. Have you ever
 (a) received a serious injury? A. No.
 (b) had a surgical operation? A. No.
 (c) had any serious illness? A. No."

The plaintiff, referring to Fink's attitude towards her prior to the accident, said that "he was very nice," but claimed that after the accident "he wasn't so pleasant like he always was. He was cranky, nervous and grouchy." She mentioned one occasion upon which her counsel comments in their brief, and which she described thus: "It was a Thursday—yes, on a Thurs-

day, he come running upstairs like a cat and dog and just scared us something terrible, and about in a half an hour later Hughie Adams come and he says, 'Is Con home?' Well, I didn't know what it was, a fight or anything. I asked him what was the matter and this and that. He says, 'I am getting crazy. All the butchers getting crazy,' he says. 'I am the next one,' he says, 'I am going next.'" Referring to another occasion, she testified: "He gave me to understand he was crazy; he was sick. He says, 'You don't know how I feel.' And he showed me he was taped from his hip clear to under his arms, and he had that quite often. He says he had kidney trouble and his head. He sit there and eat or sitting and doing nothing and just grab his hair and pull."

As a witness, the plaintiff testified that at the time of his disappearance Fink weighed one hundred and thirty-four pounds. The day following his disappearance she reported the fact to the Russell Street police station, stating that he weighed one hundred and sixty-five pounds. Seven years after his disappearance, in her claim of disappearance which was presented to the defendant, his weight appears as one hundred and sixty-five pounds.

June 29, 1929, the day of his departure, Fink, according to the plaintiff, was restless and irritable. He customarily slept upon a couch on the porch of his house but in the early part of that day he moved the couch to a place in the yard and towards evening to another place. At the usual hour when he went to work, that is, about 11:15 p. m., he departed in his car, taking his lunch with him but omitting a bottle of milk. We now quote from the plaintiff's testimony: "He forgot the milk, so I went to the front door and when I went

to the front door he just ran around the car and went in the car, just full speed, and went in the wrong direction—he went up Union Avenue to Mason. Well, that was—the man he go to work with him, he didn't stop, he went up Union, he went straight up Union Avenue, and you could hear the sound for—I think for miles. I thought he would burst the car to pieces." She explained that when he ran around the car he picked up "his best suit of clothes" which he "must have throwed out of the window" preparatory to leaving.

In the above paragraphs we reviewed the evidence which the plaintiff claims shows that when Fink disappeared he was suffering from an injury sustained two years previously. The plaintiff claims that this evidence, together with the fact that after Fink was seen upon a train the day following his departure he could not later be found although the train had not stopped, warrants a finding that death overtook him. She seems to want us to infer that he must have jumped from the speeding train. We shall now review evidence which the defendant claims indicates that before his departure Fink had become dissatisfied with his domestic establishment.

Two months prior to his disappearance the plaintiff had given birth prematurely to a child, which was her sixth. She testified that formerly she and her husband took frequent rides in their automobile, but that for some time "I wasn't able to go away so much riding. Sometime I asked him to take me places and he wouldn't do it. And one evening we was sitting and talking and he was pretty good and he says, 'You want to go for a ride?' I says, 'I don't mind.' I had a white apron on with an unbleached muslin with embroidery on it. 'Well,' he says, 'I will take you for a ride if you take that

nightgown off.' So I took it off and went for a ride. We went down Mississippi Avenue and we went down that street and we kept on going, and finally we went in the trees. 'Well,' he says, 'what do you say? You don't say nothing.' I says, 'What shall I say?' I says, 'I am with you.' he says, 'Aren't you scared?' 'Why shall I be scared? I got only one life. You are with me, and,' I says, 'I am not afraid.' So we went on. He says, 'Well, I want you to look over Portland, how wonderful,' he says, 'Portland is.' If I never bring you up here nobody will.' So he says, 'Will you get out and look at it?' I says, 'No.' * * * Then he kept on going and then by the time I know we was on Council Crest. He went on around and we went home. I says, 'I thought you wanted to take me for a ride.' He says, 'Be glad you are home.' And that was the last ride I had.'' It will be remembered that two months before his departure the plaintiff gave birth to their sixth child. Concerning it the plaintiff was asked, ''Did he love the baby?'' and answered, ''Well, he did; at least, he didn't care for—not that he hated it. He didn't seem— seems like—I don't know. He just when I talk to him— he went to the baby—the baby was sick—and he went like this (indicating) and he says, 'God would do a good deed if he would take him away.' I says, 'Why?' 'Because he wasn't anything and he never will be anything,' because the baby was only a pound and a half when it was born; it was just about two pounds when he left, and we had him on the pillows.''

Indicating still further conditions which prevailed in the home, we now quote from another part of the transcript of evidence, but before doing so, for the purpose of making the quoted part understandable, add that one of the defendant's witnesses, Christina Abra-

ham (Fink's niece) had sworn that she saw Fink after his disappearance and that the plaintiff, in rebuttal, had impugned Mrs. Abraham's reputation for truth and veracity. She had been asked whether she knew the reputation for truth and veracity of Mrs. Abraham, and in answering had sought to say that Mrs. Abraham had been before a juvenile court, had been in a reform school, and had been placed in the custody of the plaintiff, and had been in other difficulties, each time meeting with an adverse ruling. Finally, she replied: "I think it was bad." In the passage which we now quote Mr. Galton and Mr. Goldstein are the names of the plaintiff's attorneys, Mr. DeMartini is the name of the defendant's attorney, and Christina is the name by which the plaintiff's attorneys addressed her. Mr. DeMartini, in conducting his cross-examination, had just asked the plaintiff, "And when you testified that her reputation for truth and veracity was bad, what do you mean?" Whereupon the following occurred:

"Mr. Galton: Now you can go ahead, Christina, and tell him anything he wants to know.

"A. Well, if you don't stop me—

"Mr. DeMartini: No, I want to know what—

"Mr. Galton: No, you testify whatever he wants to know.

"A. If you don't want to listen to me, go ahead, but you find out all you want.

"Mr. DeMartini: I am asking her what she meant by truth and veracity.

"Mr. Galton: He has opened up the door. You tell him whatever you want now. Go ahead.

"Mr. DeMartini: No.

"Mr. Goldstein: Tell him, that is all right.

"Mr. DeMartini: If the Court please—

"Mr. Goldstein: You tell him everything.

"Mr. DeMartini: I would like to have you rule. I am asking the question what she means by truth and veracity.

"Mr. Galton: Well, she will explain it to you.

"Mr. DeMartini: The words 'truth and veracity.'

"Mr. Galton: No, no. He has opened up the door by that question, Your Honor.

"Mr. DeMartini: That is exactly what I am—

"Mr. Galton: He stuck his foot in it. Go ahead and tell him.

"A. She was a sporting woman in Wyoming, her and her sister both, if you want to know. That is her reputation.

"Mr. Galton: Now, tell him anything else you want.

"A. Well, if I want to tell the story I start in from 1929, from twelve years ago. You go ahead and prove any place you want.

"Mr. Galton: Go ahead and tell it to them, Christina. He has asked for it.

"Mr. DeMartini: I asked what she meant by the words 'truth and veracity.'

"A. Isn't that bad enough?

"Mr. Galton: Tell him the whole works. Go ahead, Christina.

"A. My husband wouldn't be that bad, run away, if it wasn't for them.

"Mr. Goldstein: Christina, tell the gentlemen what he asked you.

"Mr. DeMartini: Your husband ran away, did he?

"A. Yes, he did, because we had all them kids."

Later she was asked, "Why did you blame her for your husband going away?" and replied, "Just the way she did. She has caused lots of my grief and troubles." After the above exchange of remarks the witness was permitted to proceed without objection and described Mrs. Abraham as one who had had many escapades with men and who had become "a sporting woman." Thus, "My husband wouldn't have

been that bad, run away, if it wasn't for them" and "He did it because we had all them kids" were her final explanations of Fink's disappearance. They were given in the closing hour of the trial.

About 9:30 a. m. on Sunday, June 30, 1929, that being the day following Fink's disappearance, a man named Kunack who worked with Fink upon the night shift at the mill, called at Fink's home and inquired why Fink had not been to work the day previously. This was the first intimation that reached the plaintiff that something was wrong. The following is her explanation of what then occurred: "Well, he come to the door and he says, 'Mrs. Fink,' he says, 'where is Con?' I says, 'Isn't he working?' He says, 'He didn't come.' * * * so I looked for his new suit and it was gone. And I says, 'I guess he left me.' "

Before going Fink allowed his wages, about $50, to remain uncollected and drove his car to the usual parking place at his employer's plant permitting the key to remain in the lock. According to the plaintiff, the car had not been parked at 7:00 a. m., Sunday, but at 7:30 a. m. it was on the lot. Also, according to the plaintiff, Fink took with him in addition to the clothes he wore the aforementioned new suit and an extra shirt.

Shortly after Kunack left, the plaintiff and her son Henry called at the Russell Street police station where the plaintiff informed C. E. Dalrymple, the officer who was in charge of the station, that her husband had disappeared. The officer wrote over his signature a report of the plaintiff's complaint. At the time of the trial Dalrymple was dead, but his report, addressed to his captain and dated June 30, 1929, was received in evidence. From it we quote: "Mrs. Christina Fink, 858 Williams Ave., no phone, came into the station this

a. m. and reported that her husband, Conrad Fink, packed his belongings and left her and their six children. * * * Her husband is described as age 39 years, 5 feet, 6 inches, 165 lbs. * * * He left at about 11:30 p. m. last night in a Chev. Tour. Car. * * * Mrs. Fink is of the opinion there is another woman in the case. I instructed Mrs. Fink to * * *'' Upon cross-examination the plaintiff was questioned concerning the statement ''There is another woman in the case,'' and we now quote her explanation: ''He (Dalrymple) says, 'Well, you can see it for yourself; your husband loved you all these years. Maybe—if you know it or not' he says 'there must be some reason, either sickness or another woman.' I says, 'I don't know.' So I guess he put it down.'' Her son Henry who, as we have said, accompanied her to the police station, when asked whether his mother told Dalrymple something about another woman being in the case, answered, ''I don't say that she didn't, but I don't remember her saying that.'' Later he added ''but then this woman in the case has been mentioned—she was a grocery woman,'' and declared that her name was Winifred Quade. He testified that, according to the gossip, ''she was supposed to have run away with him.'' The plaintiff testified that Mrs. Quade and the Finks had been ''good friends,'' and admitted that after Fink's disappearance gossip associated Mrs. Quade and her husband. She said that ''there was lots of talk, you know, when you break up even with your wife they do talk lots about you.'' As a result of the gossip she called upon Mrs. O'Callaghan, Mrs. Quade's sister, and asked ''if you can tell me the truth, nothing but the honest to God truth, Mrs. Quade really be with my husband? * * * I says, 'You know the people talking.''

Sunday morning, June 30, 1929, Fink's aunt and uncle left Portland by train upon a route through Spokane. In October of 1929 they returned and called upon the plaintiff. According to the latter, "they asked me if I heard what happened to my Con and I says 'no.' They says, 'Well, he was on the same train we was.' That was on Sunday morning, about eight-thirty. He come into the depot and he look around, and they saw him run through the depot out to the train and they told him, 'Hello, Con' but he don't look back. So they get on the train, and he was sitting on the same coach they were sitting. He was sitting—so they set right behind him. They wanted to talk to him and he refused to talk. So about noon, everybody eating, and he didn't eat, so they asked him to go with them and he did. And when they say, 'Where you going?' he tell them he goes to Spokane. 'And what you going to do?' And he says, 'Don't ask me no questions, so I don't tell you no story.' So they went on and he had supper with them, and twelve o'clock they changed trains, and after they changed trains they came in the same coach again. And they say he asked them then if they wanted to get a sleeper, and they say 'No, for the first night we sitting on the train, we sitting up.' And he says, 'Well, I never sleep for a couple of nights. I will go and have a good rest.' So he went and got himself a sleeper. In the morning, nine o'clock, they were sitting eating breakfast, and he came back and was awfully excited. And so they asked him if he wanted something to eat with them. He says, 'No, I don't want anything—anything to eat.' And they said, 'Didn't you sleep good?' 'Oh, yes, Oh, yes. I go back to the smoker.' So he went back to the smoker and they wait and he didn't come, so they went to look for him and he was

gone." When the uncle went to the smoker and failed to find his nephew the train was near the Idaho-Montana line. In the Claimant's Statement of Disappearance previously mentioned the plaintiff, in reply to the direction "Give name and address of person who last saw or heard of the insured," replied, "Mrs. Margaret Fink * * * saw him get off train June 29, 1929, at a point near Idaho-Montana state line." The plaintiff denied that she had told Landry that Mrs. Margaret Fink had seen the insured get off the train, but does not question the location to which reference is being made. After the receipt of this information from the relatives the plaintiff conducted no search at the place in question. She did not consult the public records in either Idaho or Montana to ascertain whether they contained any information concerning her husband, nor did she inquire of the railroad company officials to ascertain whether they knew anything of his destination or what had become of him.

In December of 1929 the plaintiff called at the office of the district attorney of Multnomah county and asked "if they couldn't do anything to look for my husband; he had deserted me and I had six kids." As a result of her visit a deputy prepared an information of felony charging Fink with the crime of non-support which recited that he, being the husband of Christina Fink and the father of her six children, "did then and there unlawfully and feloniously, without just or sufficient cause, fail, neglect and refuse to support his said wife and minor children." December 30, 1929, the plaintiff signed and swore to the information before one of the district judges of Multnomah county. The district judge issued a warrant for the arrest of Fink which

the plaintiff delivered to Fred E. Muller, a deputy constable. The constable's office employs a printed form termed a Description Record and upon one of these Muller and another deputy by the name of Miles wrote as information received from the plaintiff: "Hangs around 3rd and Burnside St. May be rooming with his nephew Henry Miller. East 2344, Apt. No. 305. Not at this apt. Adams Bros., Butchers, Tr. 4816. Wanted by Mrs. Fink—858 Williams." Upon another slip of paper which like the description record was preserved in the files of the constable's office, Muller some days later wrote: "Fink: 425 E. Taylor, Sandy Court Apt., Apt. 300, living with nephew named Miller, he also goes under the name of Miller." The plaintiff admitted that she gave to the constable's office the information which Muller wrote upon the description record, adding, however, that when she told Muller that her husband was hanging around Third and Burnside Streets she did so because her son Henry "thought he (Fink) was in the wrong bunch and he just told me that time. It wasn't true at all." She swore that some time after her first visit she called at the constable's office again and gave the information entered upon the second sheet above quoted.

In March of 1934 the plaintiff called upon Mr. Charles Coston, an attorney, and engaged his services to obtain for her a divorce from Fink. The complaint contains the averment "that at Portland, Oregon, on the 29th day of June, 1929, defendant wilfully, maliciously and without cause or provocation, deserted, abandoned and forsook plaintiff." In an affidavit for the publication of summons the plaintiff swore: "Defendant is now residing in San Francisco, California, Care of Carsten Packing Company, San Francisco,

California, that being defendant's last known address." Mr. Coston, by registered mail, sent a copy of the complaint and summons to the address just mentioned which was returned unclaimed. In explanation of this address, the plaintiff swore that after Mr. Coston had informed her that an address was necessary she discussed the situation with her children, one of whom then told her that a number of butchers had gone to San Francisco due to a shortage of butchers at that place and to the high wages which were being offered. Having received from the boy the above address, she said she returned to Mr. Coston and gave it to him. Coston, as a witness for the plaintiff, was asked whether "Mrs. Fink did not say positively that he was down there?" and replied, "She gave me that card with the address on it, and I drew the affidavit, of course, understanding that that was the address." The plaintiff explained that she obtained the divorce because "I didn't go nowhere; I had no way to go nowhere; * * * and the oldest boy, Henry, told me if I take a divorce maybe I feel better and go more to be free; no use to stay home and weep. I says, 'I got no money.' " with the result that Henry gave her $35 for the filing fees. When asked in this trial whether the averments in the divorce complaint were true, she replied "Yes." We now quote further from her testimony:

"Q. Did you believe at that time that your husband wilfully, maliciously and without cause or provocation deserted and abandoned you? A. Well, didn't he?

"Q. Well, I am asking you, Mrs. Fink. A. Well, he disappeared; he gone.

"Q. Did you believe at that time that he had done so wilfully and maliciously, that he had deserted you? A. Well, wasn't it enough to set me down with six children when I was sick?"

Mrs. Christina Abraham, a niece of the insured, who at the time of the trial was residing in the city of Juneau, Alaska, testified by means of a deposition that in 1932 and 1934 she saw Fink, and in reply to a direction to state the circumstances, added: "Well, I seen him in Idaho for no reason at all and another time I care not to tell." In another she was asked to describe his condition to which she replied, "Fine, just felt good and working hard." As already indicated, the plaintiff imputed to Mrs. Abraham a bad reputation for truth and veracity.

Five blocks from the Finks' home was the Zion Congregational Church of which the pastor was the Reverend John H. Hopp. The latter was born in the same part of Russia of which the Finks were natives and, like them, spoke German. He had known the Finks from the time of their arrival in Portland, knew their children, and shortly after Fink's disappearance heard of that fact. Although the Finks were not members of his congregation they frequently attended its services. The witness swore: "I saw Mr. Fink in May, 1932, at the Mt. Calvary cemetery." He explained that on that day he (the witness) was attending the funeral services of an old friend and that at its conclusion as he was leaving the grave his eyes fell upon Fink. What next occurred the witness described as follows: "When the funeral service was over he (Fink) said, 'How do you do Reverend? Are you still over there in the church?' I says, 'Yes, I am.' I says, 'What are you doing over here?' 'I am working here,' he says. That is about all I got to speak with him." The witness swore that two or three weeks later he saw Fink on two occasions on the Williams Avenue streetcar. Each time they greeted one another by name. The minister was not

shown to have had any interest in the suit and manifested no ill will towards the plaintiff. A witness for the insurance company swore that the company knew nothing of Mr. Hopp's knowledge of Fink's presence in Portland in 1932 until shortly before the trial, and that then an inquiry was made of the cemetery manager who said that their books did not bear Fink's name as an employee. He added, however, that if Fink had worked as an extra or under an assumed name the name Fink would not have appeared upon the books.

We have mentioned the Claimant's Statement of Disappearance, signed by the plaintiff October 7, 1937, about eight months before this suit was instituted. This document is in the form of a questionnaire and its answers are in the handwriting of the aforementioned Landry. The plaintiff is able to write nothing more than her signature. Of the questions we quote the following:

"Did insured go away with anyone? (A) No.
"State details. (A) A Mrs. Quid left about one month later. Supposed to have meet him.
"Was there any other reason for disappearance? Explain fully. (A) Apparently left with intention of meeting a woman named Winifred Quaid. Left about one month later."

Landry testified that the plaintiff's answers to the questions were of a rambling nature, but that he was sure that he wrote their substance. The plaintiff testified that Landry read the questions to her and that the two discussed the rumors which linked Mrs. Quade's name with Fink, but denied that she said that Fink had planned to meet Mrs. Quade. Frank Young, who was living in the plaintiff's home as a roomer when this paper was prepared and who later married her, said

that he was present when Landry was asking the questions and writing the answers. After swearing that Landry seemed confused and was not properly reducing to writing the answers, he admitted that he made no protests, explaining, "I didn't know I had anything to do with it. I didn't bother with it." The instrument purports to have been verified before Wilgus D. Smith, a notary public. Both the plaintiff and Young testified that the plaintiff signed while Landry was present and the plaintiff swore that she never appeared before a notary public. Landry stated that after he had filled in the answers he handed the paper to the plaintiff, telling her that she would have to sign it and take oath to it before a notary public. Smith testified that the plaintiff called at his office with the paper unsigned, requesting his services as a notary. According to him, she signed the paper and made oath before him. Even a hasty glance shows that the plaintiff's signature and the notary's certificate were written with pen and ink different from those that were used for the body of the instrument. The Statement of Disappearance is expressly mentioned in the original complaint from which the following is quoted:

"Soon after the disappearance of the said Conrad Fink under circumstances indicating his death this plaintiff made known all the facts to the defendant company and furnished them with a purported statement of disappearance on October 19, 1936. Said affidavit being filled out by an agent of the company and signed by the plaintiff herein."

No intimation is contained in the complaint that any error was made in reducing the answers to writing, to the contrary, the complaint relied upon that instrument, and of course its verity, as a part of itself. However,

the amended complaint avers that one of the defendant's agents falsely wrote the answers, knowing that he was not writing the replies which the plaintiff was making.

It seems that Fink must have planned his leaving. A few days before he disappeared he gave his son Henry one dollar and told him to obtain a driver's license, adding that it might become necessary for him to operate their car for his mother. It will be recalled that the car with the key in the lock was left at the parking place near the sawmill where Fink generally left it during his hours of employment.

The only other testimony which we deem necessary to mention is that which bears upon the search and inquiries which the plaintiff made for Fink after his disappearance. Concerning this she was asked and answered as follows:

"Q. I ask you if you heard from your ex-husband? A. No.

"Q. Did you try to find out? A. I did.

"Q. Where he could possibly be? A. Yes.

"Q. And did you ask anyone, any of his relatives of your relatives? A. I did.

"Q. What, if anything, did you ever hear from any of your relatives or his relatives? A. Nobody saw him and nobody heard from him."

Then, in answer to a question more specific in form, she told, in the language quoted in a preceding paragraph, what she had heard from Margaret Fink. She also claims that she inquired of the aforementioned Mrs. O'Callaghan whether she knew of the whereabouts of Fink, and that she made a similar inquiry of one of the defendant's agents. The plaintiff did not name the relatives of whom she had made inquiry. Fink had a

brother and a brother-in-law in Colorado. Whether an inquiry was made of them was not disclosed. Fink was a member of the Woodmen of the World, or, at any rate, had been until shortly prior to his disappearance, and, as already mentioned, he worked in a mill the name of which was the Jones Lumber Company. There is no evidence that an inquiry was made of either the fraternal society or at the place of Fink's employment. No death or other public records, either city or state, were consulted, and, as already indicated, no inquiry was made of the railroad company which operated the train upon which he was riding following his departure from Portland. Beyond adding that she published no advertisements seeking information concerning Fink and that she had received no letters from him, the above discloses in full the efforts which were made to secure information concerning him. When asked upon direct examination whether she believed Fink was dead, she answered: "Well, I can't swear to it. I believe he is dead. If he would be alive I think he would sure be back and see his kids once at least."

The above, we believe, is a fair resume of the evidence, at least, of the part favorable to the plaintiff. Details in some instances have been omitted.

■ Since the jury returned a verdict for the plaintiff, we have no right to weigh the evidence wherever a conflict exists nor to resolve issues in favor of the defendant if the plaintiff's side is supported by competent, substantial evidence; but, if no substantial evidence furnishes a fact essential to the plaintiff's recovery, it is our duty to so declare and to pronounce the right result.

■ If Fink was in Portland in 1932, as the Reverend John Hopp stated, or was seen in 1932 and 1934, as

Mrs. Abraham averred, the plaintiff was not entitled to recover in this action, and the circuit court should have entered judgment for the defendant. Apparently, the jury believed that these two witnesses were mistaken. The character of Mrs. Abraham was impeached and the jury, therefore, had a sufficient basis for disbelieving her, but no attack was made upon the clergyman. Because of his character and lack of bias his testimony was entitled to great weight. However, identity is largely a matter of opinion and the liability to mistake constantly exists in everyone. No elaboration is needed to indicate the numerous sources through which mistaken identity may arise—faulty eyesight, poor memory, etc. The record certainly contains no basis for disbelieving the clergyman except the chance that he may have been mistaken; but even so his testimony affords an insufficient reason for directing a verdict for the defendant and of disregarding the one which was returned.

Proceeding, we are bound to say that Fink sustained two injuries, one about fifteen years before his departure and the other about two years prior to that event. Both left their marks. We pause, however, to remark that the mental torture which Fink apparently underwent can be readily ascribed to the fact that he was planning an ignoble desertion of his family. For mental distress arising from the plagues of a guilty conscience there is no potent medical aid, but for headaches caused by injury the physician can give relief. This man, in the two-year period described by his wife, his son and Portello, sought no medical help, which is a strong indication that his troubles were not physical. Into his getaway Fink introduced acting and deception. For instance, he parked his car in a place that must

have been intended to induce a belief that he had driven to his place of employment for the purpose of pursuing his labor. Had he not been seen later in the depot and upon a train, in all likelihood, a belief would have arisen that he had met with some mysterious mishap that had taken his life. And, in all likelihood, he intended that the parking of his car and his failure to draw his wages should induce such a belief and enable his wife to collect the insurance money. Even those who commit base deeds can appreciate a solace for the guilty conscience. When Fink's relatives recognized him at the depot he hurriedly ran towards the train, apparently seeking to avoid them, and when chance placed him in the same car with them he answered their questions by saying, "Don't ask me no questions so I don't tell you no story." His scampering up the stairs a month or so before his departure, which his wife said resembled a cat and dog act, may have been acting. Regardless of all this and of the injuries, the cause of his departure was not the condition of his health, but of something else. The first words spoken by the plaintiff when she discovered that her faithless mate had not reported for work the night before—spoken even before she knew that he would not return home—were, "He left me." The same words of bitter disappointment have been employed by other women upon discovering that they and their children have been abandoned by the man whose duty was their protection. In the closing hours of the trial, in the midst of a scene which was bound to bring forth the truth, the plaintiff gave this explanation: "My husband wouldn't be that bad, run away, if it wasn't for them (the two nieces)." And a moment later she declared, "He did it because we had all them kids."

■ The plaintiff's words, quoted in the preceding paragraph, sprang forth spontaneously in the course of trying situations which afforded no time for the concealment of true feelings. Since the truth ofttimes escapes unwittingly under stress of emotion, the remarks by which it is thus signified possess uncommon value as evidence. But the plaintiff also related many incidents upon which, in all likelihood, her reactions were based. For instance, we have the last automobile ride which the two took together and which started with an unpleasant reference to the plaintiff's apron as a "nightgown," and in the course of which Fink was provoked by the plaintiff's refusal to get out of the car in a dark spot where he had stopped for a purpose which the plaintiff possibly feared. Something had occurred during the course of this ride which caused Fink to declare at its conclusion, "Be glad you are home," and which also caused the plaintiff to recall it as the last ride they took together. Then also when the plaintiff, a few days before her husband's departure, held before him their two-months-old child, the tiny form struggling for life, instead of causing in him a feeling of parental interest, or at least inducing him to utter a word of sympathy, provoked the remark, "God would do a good deed if he would take him away."

We believe that in getting at the facts of this case we can apply the homely axiom that actions speak louder than words. The plaintiff's conduct after she discovered that her husband had departed is wholly at variance with any thought that she believed his health was precarious and that he sorely needed the help of his family; but is in complete accord with a belief that she regarded him as a deserter. She did not go to the Reverend John Hopp from whom they had gained

spiritual comfort on many occasions, nor to her relatives, friends and neighbors; nor did she ask Kunack, who brought her the unwelcome information concerning the night before, whether Fink's fellow workmen and his employer could be induced to enlist in a search. She sought the advice, comfort and assistance of none of these, but straightway went to the police department with a complaint that branded her husband as one who had forsaken his family. If happiness had really dwelt in the Finks' home and if the plaintiff thought that the man whom she had vowed to love and honor had helplessly wandered away, sick in body and confused in mind, this woman, who, although unlettered, was mentally alert, would have lost no time in trying to ascertain his whereabouts and to gain assistance for him. Her failure to have done anything whatever for him would have indicted her as a cold-blooded person bereft of every human sympathy. A loving wife, receiving the information which Kunack brought to this plaintiff, and who thereupon inferred that illness, mental and physical, had caused her husband to wander away, would surely have shed a tear or have given some evidence of mental distress, but nothing of that kind happened in this case. Instead of uttering a word of sympathy for her poor Conrad, she remarked, "I guess he left me," and the moment that Kunack had departed she hurried with her son to the police station where an entry was made: "Conrad Fink packed his belongings and left her and their six children. '* * * Mrs. Fink is of the opinion there is another woman in the case."

The plaintiff manifestly is not lacking in affection and kindness. The record reveals that she did her full part as the helpmate of this man who eventually lost

his affection for his family and his sense of responsibility. She bore him six children, and her influence in the home is indicated by the fact that all six have stayed loyally by her. The day he departed she was so considerate of his welfare that she ran after him with a bottle of milk which she thought he had unintentionally omitted from his lunch. A chance remark found in the transcript indicates that she baked cookies so that her husband could have them for his lunch. We must, therefore, dismiss any thought that when she learned of his departure she thought that illness was the cause of his going. Therefore, it is not strange that when the relatives told her in October that they had ridden on a train with her husband June 29, 1929, she did not reproach them for having failed to give her the information sooner so that she could have instituted an immediate search. Likewise, the fact that she did not welcome this information as a means which might enable her to locate her husband and did not follow its receipt with inquiries of the railroad company, of the police, etc., is readily explained by the fact that she realized fully what had happened. How can we infer that he may have jumped off the speeding train, as her counsel intimates we should do, when she did nothing about this information when it was given to her? If any doubt remains that she regarded her husband as a deserter, it is dissipated by what happened a month after her receipt of this information. She went to the district attorney's office and swore to a criminal complaint charging her husband with the abandonment and non-support of his family. She handed the warrant of arrest to the constable with the statement that Fink had used an assumed name and might possibly be located in the company of one of his nephews named

Miller in the latter's apartment; and still later she obtained a divorce and then remarried.

Whether there is another woman in the case or not, this is an instance where a man deserted his family and where his wife, realizing that fact, thrice placed evidence of her belief upon the public records: (a) a report to the police; (b) the records incidental to the criminal proceedings; and (c) the papers in the divorce suit. While she sought to retract some of the entries concerning "another woman in the case," she retracted none of her statements which stigmatize Fink as a man who wilfully deserted his wife and children. And, finally, we add that there is no evidence that Fink was manifesting affection for her in the period of a year or so preceding his departure. The evidence does not indicate that theirs was a happy home.

This is, therefore, an instance in which the disappearance was due to a determination to desert wife and family, and is not one which can be explained by illness. At any rate, the former is as available as an explanation as the latter and the facts concerning both are vouched for by the plaintiff. However, before coming to a conclusion concerning the desired presumption of death, let us consider our statute and review the authorities.

██ We start our inquiry with the knowledge that Fink was living the day following his departure from Portland, and since the law authorizes a presumption that "a thing once proved to exist continued as long as is usual with things of that nature" (§ 9-807, subd. 33, Oregon Code 1930), a conclusion is warranted that Fink, whose life expectancy was between twenty-eight and twenty-nine years at the time of his departure (Table of Mortality, 41 C. J., p. 216), was still alive when

this action was begun, unless the record furnishes sufficient reason for believing the contrary. Therefore, the burden of proof rests with the plaintiff to overcome the presumption of life and to furnish evidence from which death may be inferred.

■ Section 9-807, subd. 26, Oregon Code 1930, includes among the disputable presumptions there enumerated the following: "That a person not heard from in seven years is dead." This enactment was not, in our opinion, intended to create some new rule concerning the effect of seven years of unexplained absence, but was merely intended as a statement of the existing law upon the subject with which it deals.

■ The rule whereby death may be inferred from seven years' unexplained absence, as has been many times said, was based upon necessity, and, as pointed out by Professor Thayer in his Preliminary Treatise on Evidence, p. 319, was born of the Bigamy Act of 1604 and of the Remainder Act of 1667. The first of these two acts was intended to prevent the prosecution for bigamy of a deserted wife; and the second was to enable the reversioner to come into possession of the estate when the life tenant had gone beyond the seas or in some other way had absented himself for seven years without leaving available sufficient proof of his life. Conditions were primitive at the time those enactments were made. Means of communication and of travel were few and slow. The mail, cable, radio, telegraph and telephone, which enable a traveler today to keep in close touch with his home, were unknown. When a person left his community to go upon a journey very little information could be known at home concerning him until he returned. When an accident happened there were no police or hospital records in which to make

entry of it. Police investigations, coroners' inquests and burial records were matters for the future. Therefore, illness, accident and death frequently left no written records whereby those who might later seek to trace the victim would be rewarded in the search. Searches and inquiries instituted for one who had disappeared from home under those conditions were not only expensive, but also quite hopeless. Necessity, therefore, demanded that some conclusion must be drawn from the only facts available: (a) absence, and (b) an inability to account for the silence and absence except by presuming death. For the reasons above indicated, the statutes which we have just mentioned were enacted, and for the same reasons they served eventually as the seed which germinated the presumption arising out of seven years of absence and lack of tidings capable of explanation only by presuming death. The presumption became a short cut between the known facts and death which was the only reasonable conclusion which could be drawn.

But today when "not a sparrow falleth to the ground" without the incident being photographed for the newsreel and the fact being recorded by some inspector, searches and inquiries frequently yield results. Accordingly, a shift has occurred in the values placed upon the different elements which create the presumption of death. Wigmore on Evidence, 1934 Supp., § 2531B states: "One's decision as to death or non-death may in a given case be easy or difficult, clear or doubtful; but the delay of seven years can rarely be an important item in reaching that decision." The facts attendant upon the departure and the results disclosed by a search may clear up the matter at once leaving nothing to depend upon the termination of the seven-

year period. In other words, the adjective in the oft-repeated term "unexplained absence" has come to possess greater significance than the noun, and the courts are rarely satisfied until a search, pursued with the degree of diligence suggested by the circumstances, has taken place.

■ While the presumption of death is a procedural expedient which is the product of necessity, reason has supplied many of its elements and continues to guide its application. The presumption is based in large measure upon the fact that "there is no place like home," and that implanted in the human breast is an instinct to return home. Therefore, when an individual who has a happy home disappears from it under circumstances that do not indicate he left voluntarily; when his family and all others who would naturally hear from him receive no word; when search and inquiry, immediately undertaken and pursued with reasonable diligence in all places likely to yield results, fail to produce anything showing him to be alive; when search is renewed whenever a new clue is obtained which reason suggests ought to be investigated; and when the absence and silence are incapable of any reasonable explanation short of assuming that the individual must have died, the seven years of absence and silence authorize resort to death as the most probable explanation of the situation.

■ In making the above statement of the presumption of death rule, we realize that all of the decisions have not demanded that a search and an inquiry for the missing persons were requisites. But the great majority of them hold that search and inquiry are necessary: Jones' Commentaries on Evidence (2d ed.), § 288; 16 Am. Jur., Death, p. 28, § 33; 17 C. J., Death, p. 1171,

§ 11. The few decisions which have not insisted upon search and inquiry are susceptible to explanation. For instance, in *Innis v. Campbell*, 1 Rawle 373, the missing person was aged and had been absent for twenty-four years. Concerning her the court said: "The chances are unfavourable to the presumption of her having been alive at the time of the trial." In *Maley, Executrix v. Penna. R. R. Co.*, 258 Pa. 73, 101 Atl. 911, L. R. A. 1918A, 563, the issue concerned two brothers each twenty years of age at the time of disappearance. According to the decision, "during the long period of twenty years which elapsed since the departure of the sons no word was received from either of them, or reasons shown for their going away, or their destination given. * * * There was nothing to indicate to the father the possible destination of his sons; had such act been known to him reasonable search should be required to be made at the place where the boys were last known to live." In *Miller v. Sovereign Camp, Woodmen of the World*, 140 Wis. 505, 122 N. W. 1126, 133 Am. St. Rep. 1095, 28 L. R. A. (N. S.) 178, the court held that proof of diligent search and inquiry at the absentee's last known place of residence was not an essential to the presumption of death. See to the same effect *Page v. Modern Woodmen of America*, 162 Wis. 259, 156 N. W. 137, L. R. A. 1916F, 438, Ann. Cas. 1918D, 756. These decisions are deemed unique and are the foundation for the so-called Wisconsin rule. In *Delaney v. Metropolitan Life Ins. Co.*, 216 Wis 265, 257 N. W. 140, the court, in explanation of the Wisconsin rule, said: "If the obligation to institute a diligent search were required, it could only be upon some ground of policy." Virtually all of the courts, however, deem search and inquiry indispensable elements of the presumption rule. The

extreme of the Wisconsin rule developed in *Ewing v. Metropolitan Life Insurance Co.,* 191 Wis. 299, 210 N. W. 819, wherein it appeared that the missing person, a Mrs. Ewing, left her home because conditions there were unsatisfactory. After departing she did not correspond with her husband because she had informed him when she left that he would never hear from her again. Her age at the time of going was such that she probably was living at the time when the suit was instituted. In holding that a presumption of death was nevertheless available, the court said: "While it is true that an explanation why a person leaves home is in a sense an explanation of his absence, yet the rule is satisfied by a lack of intelligence or tidings for seven years even if a reason for the absence is shown." In other words, it believed that absence alone for seven years sufficed. Shortly after the decision last mentioned was announced *Hansen v. Central Verein,* 198 Wis. 140, 223 N. W. 571, 64 A. L. R. 1284, was decided which held that to presume death, where the disappearance is explained, is a challenge to common sense. The Wisconsin rule had its inception with *Cowan v. Lindsay,* 30 Wis. 586, wherein Greenleaf's early explanation of the rule was accepted literally. In *McLaughlin v. Sovereign Camp, W. O. W.,* 97 Neb. 71, 149 N. W. 112, L. R. A. 1915B, 756, Ann. Cas. 1917A, 79, the Nebraska court seemed to regard with some favor the Wisconsin rule, but nevertheless indicated that whether search and inquiry were essentials was dependent upon the facts of the case. We are satisfied that, in the absence of special circumstances such as, for instance, old age, search and inquiry, promptly instituted and prosecuted with reasonable diligence, are requisites to the presumption of death rule.

But we all know that there are instances of disappearance of men from whom no tidings have been received which can be explained without presuming death. In some of these domestic discord had developed; in others there was "another woman in the case;" and in still others the individual had committed a crime which coming to light caused him to flee. In all of these the failure to communicate with those at home can be explained without presuming death.

In *Hansen v. Central Verein D. G. U. G. Germania,* 198 Wis. 140, 223 N. W. 571, 64 A. L. R. 1284, a judgment for the plaintiff, the beneficiary of a certificate of life insurance which named her husband as the insured, was reversed. In the lower court death had been presumed from his eight years' absence. The husband, after serious trouble with his wife and children, had been arrested upon a complaint of the wife which charged him with abandonment. Later a judgment of conviction was entered which placed him upon probation. Shortly after the entry of the judgment he disappeared. A search conducted by the police, the probation officers and his family was unsuccessful. The court said:

"This presumption of death is based on the fact that persons who are absent from their homes will naturally return or at least communicate with their relatives and friends at home. While some of the earlier writers stated that the presumption of death arose from lack of information after seven years' absence, the modern writers made it an essential part of the rule that the absent person shall have been unheard of by those who would naturally have received news from him, if he had been alive. Thayer, Preliminary Treatise on Evidence, 348; Stephen, Evidence, 149; 4 Wigmore, Evidence, p. 3579; 2 Chamberlayne, Modern Law of Evidence,

p. 1347; 1 Jones, Commentaries on Evidence, 302; 17 Corp. Jur., p. 1173.''

The court believed that since the insured's relations with his family had been strained to such an extent that a criminal judgment had been entered against him upon a charge preferred by his wife, and he had been placed upon probation, he would not have sent any information home concerning himself for fear lest the family would transmit it to the police. Therefore, the court concluded that a presumption of death was not available. Following the reprint of this decision in 64 A. L. R. 1284 is a digest of similar decisions.

In *Marquet v. Aetna Life Insurance Co.*, 128 Tenn. 213, 159 S. W. 733, L. R. A. 1915B, 749, Ann. Cas. 1915B, 677, the court, in reversing a decree for the plaintiff, beneficiary of a policy of insurance, based upon the life of her husband who subsequently disappeared, declared:

''The mere fact that he has not been heard from in Chattanooga, either by any member of his immediate family or others within the past seven years, is of little weight when considered in connection with the complete estrangement between himself and the complainant and his children, resulting from the divorce proceedings. He was enjoined by solemn decree of the court from attempting to have any relations with complainant or with his minor children. All of the children of this unfortunate marriage are shown to have sympathized with the mother in the divorce proceedings, and the father during the seven years of unexplained absence was an outcast from his family.''

In *Goodier v. Mutual Life Insurance Co.*, 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383, the court reversed a judgment obtained by the beneficiary upon a policy of

insurance where death had been presumed from the disappearance of the insured. For twenty-nine years the insured and his wife (plaintiff) had enjoyed a happy marriage and were the parents of three children. The insured had local prestige. In 1914 when he was fifty-six years of age he disappeared. Immediately prior to his disappearance illness had confined him to a sanitarium. About this time it was discovered that he had embezzled large sums of money. On the day of his disappearance he left the sanitarium to confer with an attorney. After the conference he was never seen again, and shortly ten indictments were returned against him. His disappearance was succeeded by a search instituted by the plaintiff which the court, however, said "was not as thorough-going as modern facilities make possible." In 1919 she obtained a divorce on the ground of desertion, concerning which the court said:

"Whatever she may have believed, her complaint in the divorce action was a solemn assertion that her husband was then living. Giving the circumstance of divorce a no more weighty evidentiary character than that of an admission, it is at least more persuasive than the ordinary admission against interest."

The policy of insurance expired December 12, 1918, about four years after the disappearance. The jury in a special verdict found that the insured had died shortly after his disappearance. In reversing the resulting judgment, the court said:

"In the case of Goodier, the splendid character of his wife and children, and the reputation he himself had always borne, were so much and so distinctly the opposite of his own criminality, about to be exposed to them and to the world, that there was every reason why he should disappear forever not only from their presence, but also from their knowledge."

*Petition of Talbot,* 250 Mass. 517, 146 N. E. 1, concerned the efforts of a purported widow to have herself appointed administratrix of the estate of W. H. Talbot (her husband) who, she claimed, died January 15, 1924. The two were the parents of one son. The relationship between the two had not always been harmonious, but Talbot was fond of his son and of his aged father. For a number of years he had been calling upon a married woman who left her home, without the knowledge of her husband, on the same day Talbot disappeared, September 4, 1915. Four days later he sent his wife some papers by which she could obtain some of his belongings. In his desk were three letters from him, one addressed to her, one to the boy and one to both. One of these stated that he had been miserable at home and could not live "this way any longer." It expressed a hope that some day he would have his son with him. The letters also effected a division of his property and, in expressing a regret that he could not leave his family more, stated that he needed something "to start anew with." Ten years after his disappearance the petitioner instituted the proceedings under review. In affirming the lower court's decree which held that these circumstances did not indicate death, the decision stated:

"Absence alone, no matter how long continued, is not sufficient to raise the presumption of death. * * * It must appear that the person who had gone away had not been heard from by those who would be likely to hear from him if he were alive. * * * If the facts disclosed and the circumstances surrounding a person's departure from home indicate that he would not be likely to communicate with his family and former associates, and are such as to account for his absence unheard of, the presumption of death does not arise."

The court then said that the facts did not indicate that the husband had gone away for a temporary purpose,

"but with the intention of abandoning his family and business and start anew in some other place. His infatuation for the woman who disappeared at the same time he went away would justify the inference that he left under such circumstances that he would not be likely to let his family and former associates hear from him or know where he was."

In *Heath v. Salisbury Home Telephone Co.*, (Mo. App.), 27 S. W. (2d) 31, the plaintiff and one Charles Prine were married in 1913. She described Prine as a "sort of a roving, harum-scarum sort of a fellow." In 1914, his occupation taking him to Oklahoma, the two moved there. Six weeks later, according to her, "he insisted that I go back there (Moberly, Missouri)" which she did on December 31, 1914. She never saw her husband again. On February 12, 1915, she bore him a child. After she returned to Moberly she received two or three letters from him and once the sum of $15. The last letter came in April, 1915. In the lower court the plaintiff prevailed. The court of appeals held that these facts were insufficient as the foundation for a presumption of death, pointing out in detail the insufficiency of the search that had been conducted. The court applied the following which it quoted from *Flood v. Growney,* 126 Mo. 262, 28 S. W. 860:

"The rule now is general that a person shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death."

After expressing a belief that Prine had abandoned the plaintiff, the court stated: ''There was no probability that Prine would communicate with the plaintiff and his child whom he had abandoned.'' It held that the fact that the plaintiff had not heard from her husband after he had deserted his family could not create a presumption of death. The supreme court in *Heath v. Salisbury Home Telephone Co.*, 326 Mo. 875, 33 S. W. (2d) 118, affirmed the result reached by the court of appeals. It said:

''The only reasonable conclusion under this evidence is that Prine was anxious to escape the burden and inconvenience of parenthood, and that he did not have the devotion to or the affection for his wife which ordinarily is sufficient to cause a man to return to his wife, if he is able to do so, or to communicate with her, if he cannot go to her. In fact, plaintiff's evidence tends to show abandonment of her by Prine, and hence that there was no reason why he would likely wish to communicate with her. * * * Plaintiff's evidence also fails to show that Prine would likely have communicated with her, even if alive and able to do so. In other words, Prine's absence from and failure to communicate with plaintiff may be accounted for on a very rational theory other than that of his death.''

In *Grunda v. First Lithuanian B. & L. Assn.*, 128 Pa. Sup. Ct. 604, 194 Atl. 747, the plaintiff, John Grunda, sought to recover the withdrawal value of ten shares of stock issued by the defendant to ''John Grunda and Anna Grunda, his wife.'' He claimed that Anna left home in 1929, and that since six years had passed before he started his action, her death must be presumed. In rejecting his contention, the court said:

''In order to support a presumption of death following seven years' absence or disappearance, the absence

or disappearance must be unexplained * * * . If the facts presented on the trial carry with them a reasonable explanation of the absence, other than death, showing a motive for the party's absence and silence, the presumption does not take effect. It is 'confined to cases where the circumstances are such as reasonably to forbid any explanation other than death.' So, too, the evidence should establish a reasonably sufficient inquiry concerning the absence or disappearance of the supposed decedent. * * * All of the evidence produced by the appellant shows an intentional leaving by his wife of their common dwelling, which was intended to be permanent, and explains her subsequent failure to communicate further with him, and, taken in connection with his insufficient inquiry as to her subsequent actions and whereabouts, warranted the action of the court below in entering the compulsory nonsuit.''

In *Town of Van Buren v. City of Syracuse,* 72 Misc. Rep. 463, 131 N. Y. S. 345, it appeared that Henry Jackson, a man of intemperate habits, who upon a previous occasion had deserted his family for three years, after rejoining them had abandoned them again. After his second disappearance had continued for ten years and nothing had been heard from him, the proceeding under review was instituted. At the time of his second departure a warrant issued for his arrest. In holding that these circumstances did not create a presumption of death, the court said:

''A deserting husband and father is the last person who ordinarily would communicate his whereabouts to the persons whom he had wronged and for whose support he was responsible.''

It quoted the following from Lawson's Law of Presumptive Evidence, p. 294, rule 53:

''But the presumption of death at the expiration of seven years from being last heard of does not rise

where it is improbable that the absentee, even if alive, would, or could have been heard of at, or would or could have communicated with his residence, home or domicile.''

We reviewed the above decisions, not under any misapprehension that any of them dealt with facts in all respects similar to those before us, but because they illustrate the circumstances under which the courts refuse to presume death. The plaintiff cites many authorities, all of which we have examined. They, like the above, did not deal with situations entirely similar to the one before us. The decision upon which the plaintiff places the greatest reliance is *Arden v. United Artisans,* 124 Or. 225, 264 P. 373, concerning which she states: ''It is the sole Oregon decision in this field.'' With the latter observation we agree. The insured in that case had obtained a certificate in the defendant organization which named the plaintiff as the beneficiary. The latter, having no direct evidence of death, depended upon the presumption. The insured was a working man whose efforts to earn a livelihood for his family and himself had caused him to become a wanderer. October 1, 1914, the plaintiff received a letter from him written in Reno, Nevada, where he was then employed. The letter was couched in affectionate terms and was the last word the plaintiff received from him. Two weeks later she wrote to him but her letter was returned undelivered. Thereupon she instituted a search which was prosecuted with reasonable diligence. The relationship between all members of the family had been affectionate. When nothing was heard from the insured for more than seven years the action under review was instituted. It appeared that for some time prior to October 1, 1914, the insured had suffered

severely from rheumatism, particularly so just before his disappearance. In the circuit court, judgment, based upon the verdict of a jury, was entered in favor of the plaintiff. In sustaining this judgment, this court said:

"We think the evidence would justify the jury in concluding that the sudden cessation of all intercourse or correspondence with Arden's family was due to his death and while there is room for the opposite theory, the jury and not the court were the judges under the circumstances. So we believe that their finding that Arden was dead and that he died before he became delinquent is a verdict which they had a legal right to render under the circumstances."

It will be observed that, unlike the cases previously reviewed, this case was not an instance where matrimonial harmony was lacking. It will also be observed that in this case the insured was shown to have been suffering from a serious illness immediately prior to the time when nothing further was heard from him.

*Lesser v. New York Life Insurance Co.*, 53 Cal. App. 236, 200 P. 22, being another decision upon which the plaintiff relies, contained no element of domestic discord, nor did the court in that case resort to the presumption of death rule. The insured in that case was last seen at a place where he was within the range of a special peril. Shortly before that he stated that he was going to a beach to bathe and was last seen within a few feet of a bathhouse fully dressed. His clothes and jewelry were later found in one of the dressing rooms. His disappearance was given extensive publicity. His body did not drift ashore and the disappearance was succeeded by extensive inquiries, not only locally, but in various states of the Union. Noth-

ing was heard of him. The action under review was instituted without waiting for the seven-year period to expire. Death was held inferable from the circumstances above mentioned.

In *Cox v. Ellsworth,* 18 Neb. 664, 26 N. W. 460, 53 Am. St. Rep. 827, also cited by the plaintiff, death was inferred in the same manner as in *Lesser v. New York Life Insurance Co.,* supra. Mitchell Clement was the grantee of a deed which the plaintiff in that case sought to reform. Clement at the time of his disappearance was sixty-three years of age and was greatly attached to his family and home. He was sober, industrious, and in comfortable pecuniary circumstances. At the time of his disappearance the active season for his business was about to commence. On the day of his departure he left his home without expressing any intention of going upon a journey and without taking anything with him except the clothes he wore. He was a buyer of corn and after leaving home withdrew $1,800 from his bank. After the withdrawal he was never seen again, although inquiry was made of all of his relatives and connections. An extensive search was made for his body by the people of the village in which he resided, for they believed that some accident had befallen him. Without waiting for seven years to pass, the suit was instituted upon the theory that the above facts indicated Clement's demise. In sustaining the judgment of the lower court, predicated upon a belief that Clement was dead, the court said:

"But when the inquiry arises before the expiration of seven years, and the facts and circumstances of the person are proved to have been such as to compel the thoughtful and experienced mind to believe that, if still living, such absent person would have returned to or communicated with his home, wife, children, relatives

or friends left behind, or to the care and enjoyment of property abandoned, and that he has never returned, in such case, although the period of seven years has not elapsed, the presumption of continued life may be held to have ceased.''

This was another instance of exposure to peril.

In the two cases just reviewed domestic happiness and favorable financial circumstances convinced the court that the insured had had no thought of abandoning his home and his family. These circumstances, together with the fact that the insured had encountered a specific peril capable of taking his life, induced the court to believe that a finding of his death immediately after his disappearance was warranted.

*Kansas City Life Insurance Co. v. Marshall,* 84 Colo. 71, 268 P. 529, 61 A. L. R. 1321, also cited by the plaintiff, was an action upon a policy of insurance which named James W. Marshall as the insured and his wife, the plaintiff, as the beneficiary. Marshall disappeared September 8, 1920, and more than seven years later the action under review was instituted upon the theory that his absence under the circumstances which we shall now state created a presumption of death. At the time of his disappearance he was forty years of age and was a farmer. He, the plaintiff and their three children led a happy domestic life. On the day of his disappearance he left for Denver with the intention of attending a funeral. He, however, did not appear at the funeral and ten days later his truck was found in a Denver garage loaded with many articles which he had purchased for his family and his farm. Before going he had taken nothing with him except the clothing he wore. He was healthy, sober, industrious and of good habits. While his financial circumstances were doubt-

ful, the decision described him as "a contented and hopeful man." The facts attendant upon his disappearance were published in a Denver newspaper, the police were notified, and in the seven years following his disappearance no tidings concerning him had reached his family. In holding that death was inferable from these circumstances, the decision stated: "We do not find that the defendant seriously contends that the evidence is not sufficient to justify the jury's finding that Marshall is dead." Apparently the only serious issue in the case was whether the evidence indicated that death had taken place before the policy of insurance had expired.

 We shall now endeavor to apply the above principles of law to the facts before us. Fink's departure was not accompanied with any manifestations of an intention to return home. His departure and the circumstances immediately preceding it indicate that he had planned a break from home and family. His home no longer yielded to him happiness. Unjustifiable as his feelings undoubtedly were, he apparently had come to regard his wife and at least one of his children with disfavor. Let us recall the plaintiff's own words. She testified that her husband left "because we had all them kids." And added, "My husband wouldn't be that bad, run away, if it wasn't for them (his nieces)." The matrimonial status and parenthood had become irksome to this man. It is clear that he desired to conceal his destination. He did not tell his wife and family that he intended to go. When his aunt and uncle asked him on the train, "Where are you going?" and "What you going to do?" he replied, "Don't ask me no questions so I don't tell you no story." Six months after Fink's departure a warrant was issued

for his arrest which the officers unsuccessfully tried to serve. The observations made by the court in *Hansen v. Central Verein,* supra, have application to this case. The above being the facts, Fink's failure to return home and to communicate with his family can be explained without presuming death. And since his absence and the lack of tidings from him can be explained without believing that he died, the law will indulge in no presumption of death. We have not overlooked the fact that when Fink departed he was manifesting symptoms of ill health. However, for two years following the accident to which the plaintiff attributes the symptoms, her husband continued at his daily toil uninterruptedly without consulting a physician. His work in the slaughterhouse which apparently had had a depressing effect upon him was discontinued three months before he disappeared. After the accident one of the two policies of insurance was issued. At that time Fink made no complaint concerning his health and the defendant discovered no disability. So far as we can observe, the plaintiff uses the evidence of ill health as a basis for suggesting—obliquely suggesting—that it be inferred that possibly Fink jumped from the speeding train near the Idaho-Montana line; but the law does not indulge in presumptions of suicide; quite to the contrary, the presumption is that all possess the instinct of self-preservation, and that all endeavor to avoid danger: Jones, Commentaries on Evidence (2d ed.) § 254; 22 C. J., Evidence, p. 94, § 35; *Carlson v. Equitable Life Assur. Society,* 188 Minn. 43, 246 N. W. 370. Possibly the plaintiff believes that the evidence concerning her husband's ill health justifies an inference that he died from it. However, no physician described the nature of Fink's illness and no one ven-

tured an opinion that it was of a fatal nature. The evidence describes Fink as of sober, industrious habits. At the time of his departure he was thirty-nine years of age with a life expectancy extending over many years. In *Carpenter v. Modern Woodmen,* 160 Iowa 602, 142 N. W. 411, the insured when last seen was in the final stages of tuberculosis. In *Caldwell v. Modern Woodmen,* 89 Kan. 11, 130 P. 642, the insured, in his last communication to his family, stated that he was confined in a pesthouse seriously ill with smallpox. In *Supreme Lodge of Pathfinders v. Johnson* (Tex. Civ. App.), 168 S. W. 1010, when the insured left he was suffering from a general physical breakdown. In *Leach v. Hall,* 95 Iowa 611, 64 N. W. 790, the individual who disappeared was of an affectionate disposition and was warmly attached to his mother and sister. When he was last heard from he was sick with consumption. In all of those cases the individual at the time of his disappearance was upon cordial relationships with his family, and in all of them, with the exception of the last, a diligent search was instituted which proved unavailing. In each instance a presumption of death was held available. In *Matter of Ackerman,* 2 Redf. Sur. 521, the disappearance concerned an annuitant, 66 years of age, who was suffering from an incurable disease. When he last called for the annuity, upon which he was dependent for his support, he gave no indication of an intent to depart. He was never afterwards heard from. In *Cambreleng v. Purton,* 58 Hun. 610, 12 N. Y. S. 741, the disappearance was that of one Colvill who was a chronic drunkard. His frequent protracted periods of intoxication had seriously affected some of his organs. Before his disappearance his physician believed that he might die at any time and insisted that he must not be

permitted to leave his room. In 1874 he disappeared and although diligent inquiries for him were made, no trace of him could be discovered. It was held that in 1881 an inference of death was justifiable. In *John Hancock Mutual Life Insurance Co. v. Moore,* 34 Mich. 41, the individual who disappeared "could not easily have gone unnoticed," and further, according to the decision, he "was in such a physical and mental condition as to excite the anxiety of his friends." A search failed to yield results. It was held that after seven years a presumption of death was available. In *Webster v. Birchmore,* 13 Ves. Jr. 362, 33 Reprints 329, the subject of the litigation when last seen was "in a desperate state of health," and at that time expected to return in six months. He was never seen again. The court held that a presumption of death was available. In *Goodier v. Mutual Life Insurance Co.,* supra, the assured at the time of his disappearance was afflicted with ill health and in fact was confined in a sanitarium. Neither that circumstance nor the fact that he was upon affectionate terms with his family sufficed to create a presumption of death. His disappearance and subsequent silence were explainable by his financial misdeeds. In the present instance, to assume that Fink's illness caused his death or to infer death by the use of the rule stated in *Lesser v. New York Life Insurance Co.,* supra, and *Cox. v. Ellsworth,* supra, would be to engage in pure guesswork. Death from his illness is no more to be assumed under these circumstances than if he had remained at home. His actions upon the train were not those of an ill man, but of one engaged in an ignoble deed experiencing the sensation of frustration.

Further, we do not believe that the plaintiff conducted a search with the required degree of diligence. We are willing to believe that her financial resources were meager. A slender purse necessarily limits one's ability to conduct a search. However, the evidence indicates many sources of information entailing no outlay in money which she neglected. As already indicated, she did not claim that she made inquiries from her neighbors, friends, Fink's fellow employees or the Reverend John Hopp. As a witness, she related the conversation which she had with Mr. Kunack on the morning he brought her the information that Fink had not reported for work, but she did not claim that she inquired of him what he knew about Fink's plans. Nor did she claim that she made any inquiries of Fink's former fellow employees in the slaughterhouse. Portello testified but was not asked whether he knew of Fink's plans at the time of his disappearance or whether he knew of Fink's whereabouts after leaving. The managers of the sawmill and the slaughterhouse were other possible sources of information which were untouched. When she was asked, "Did you ask anyone, any of his relatives, of your relatives" concerning the disappearance, she replied, "Yes." This may have been intended to include Fink's Portland nephew to whose apartment she, six months later, directed the constable, with the statement that possibly Fink was living there; and it may have included Fink's relatives whom she listed upon the statement of disappearance; but it certainly did not expressly include them. As already indicated, she did not inquire from the railroad and train officials when Margaret Fink and her husband, two months after the disappearance, reported to her that they had ridden east with her husband upon

the day of his disappearance. An inquiry at that time might have solved the problem. No reasonable mind, in our opinion, would say that this inquiry should have been neglected.

From *Modern Woodmen v. Ghromley*, 41 Okl. 532, 139 P. 306, L. R. A. 1915B, 728, Ann. Cas. 1915C, 1063, we quote:

"Ordinarily, where it is sought to fix the presumption of death upon one who is absent from home, there must be proof of inquiry made of the persons and at the places where news of him, if living, would most probably be had. 2 Greenl. Ed. 16th ed. § 278; Chamberlayne, Modern Law of Ev. §§ 1100, 1101; 2 Whart. Ev. § 1274; Posey v. Hanson, 10 App. D. C. 496; Wentworth v. Wentworth, 71 Me. 72; Flynn v. Coffee, 12 Allen 133; Shriver v. State, 65 Md. 278, 287, 4 Atl. 679. * * * In Hitz v. Ahlgren, 170 Ill. 60, 48 N. E. 1068, it was announced by Mr. Justice Phillips that, in order to enforce the presumption of the death of a person after an absence of seven years, there must be evidence of diligent inquiry at the person's last place of residence and among his relatives, and any others who would probably have heard from him, if living. In Modern Woodmen v. Gerdom, 2 L. R. A. (N.S.) 809, 7 Ann. Cas. 570, many authorities are gathered in a footnote. In the opinion it was held that the inquiry should extend to all those places where information is likely to be obtained, and to all those persons who, in the ordinary course of events, would be likely to receive tidings if the party were living, whether members of his family or not; and, in general, the inquiry should exhaust all competent sources of information, and all other which the circumstances of the case suggest."

It is a serious matter to say that a jury lacked support for its verdict. Generally, the extent to which a search should be conducted is an issue for the jury, but in the present instance we believe that the search

was so lacking in diligence that no reasonable mind could say that it was conducted with the required degree of diligence. Certainly, the omission of an inquiry following the receipt of the information which the aunt and uncle brought home three months after the disappearance renders it impossible to say that a sufficient foundation is present for a presumption of death. To hold otherwise would be to discard entirely the requirement that search and inquiry are necessary. We also believe that the nonreceipt of tidings can be reasonably explained without presuming death. For both reasons we conclude that the jury's verdict lacks the support of substantial evidence. The circuit court erred when it denied the defendant's motion for a directed verdict.

RAND, C. J., and KELLY and BELT, JJ., concur.