NORTHWESTERN MUT. LIFE INS. CO. v. STEVENS et al.

BANKERS' LIFE ASS'N OF MINNESOTA v. SAME.

(Circuit Court of Appeals, Eighth Circuit. December 16, 1895.)

Nos. 635 and 636.

1. LIFE INSURANCE POLICY—PRESUMPTION OF DEATH.
    In an action on a policy on the life of one who disappeared about a year before the commencement of suit, it is proper to charge that the death of an absent person may be presumed in less than seven years from the date of the last intelligence from him, from facts and circumstances other than those showing exposure to danger which might probably result in his death.

2. SAME.
    It is also proper to charge that, while seven years is the period at which the presumption of continued life ceases, this period may be shortened by proof of such facts and circumstances connected with the person whose life is the subject of inquiry as, submitted to the test of reason and experience, would force a conviction of death within a shorter period.

3. SAME—INSTRUCTION NOT APPLICABLE.
    An instruction based upon the assumed state of facts to which no evidence applies is erroneous.

4. CHARGE TO JURY—APPEAL TO SYMPATHIES.
    In an action against an insurance company by the widow and child of the insured, the court opened his charge by stating that, when women and children were connected with a case, he made it a rule to say as little as possible to the jury, because his sympathies frequently got the better of his judgment, and he subsequently said that, while he always tried to close his eyes to the fact that a woman and child had an interest in a suit, he could not always do it, and did not suppose the jury could, and proceeded: "It is not expected. If a man can do that, he is no better than a brute. He is as bad as the heathen is supposed to be, and worse than the horse thief is thought to be. If he could close his eyes to that fact, lose all sense of decency and self-respect, he would not be fit for a juror." *Held*, that this was ground for reversal of a judgment in favor of plaintiffs.

In Error to the Circuit Court of the United States for the District of Nebraska.

Actions by Jennie S. Stevens and Jennie S. Stevens as next friend of Maud Stevens,—one against the Northwestern Mutual Life Insurance Company, and the other against the Bankers' Life Association of Minnesota. Judgments were rendered in favor of plaintiffs in each case, and defendants bring error. Reversed.

J. W. Deweese (F. M. Hall was with him on the brief), for the Northwestern Mut. Life Ins. Co.

James W. Dawes (Joseph R. Webster was with him on the brief), for the Bankers' Life Ass'n of Minnesota.

F. I. Foss (Geo. H. Hastings, E. E. McGintie, and W. R. Matson were with him on the brief), for defendants in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge. The life of George D. Stevens was insured by each of the plaintiffs in error for the benefit of his wife and child, the defendants in error. The latter brought actions

against the insurance companies for his death. In their complaints they alleged that Stevens was dead, and that they had given notice and made the proof of his death in July, 1893. The policies provided that the companies would pay the amounts insured 60 days after notice and due proof of the death of the insured. The companies denied in their answers that the insured was dead, and denied that the defendants in error had given them notice of proof of his death 60 days before the actions were commenced. The two actions were tried at the same time and to the same jury, who returned verdicts against the companies. The errors assigned are to the charge of the court; and they relate principally to the rules that should govern a jury in determining whether a man who disappeared less than seven years before an action for his death was commenced was dead before the commencement of the action.

The salient facts in the case were undisputed, and they were these: On August 19, 1892, Stevens lived at Crete, in the state of Nebraska. He was the owner of all but five shares, of $100 each, of the State Bank of Nebraska, and was its cashier and manager. His wife owned the other five shares. The capital of the bank was originally $50,000, but that capital had been impaired to the extent of $38,000. The state bank examiner had discovered this fact in July of that year, and had notified Stevens that the bank would undoubtedly be closed unless the capital was restored to $50,000. Stevens had been endeavoring for many days to sell $38,000 of the stock of the bank, which was unissued, in order to restore its capital, but he had failed. The bank was insolvent. Stevens had some real estate in Crete, which was worth about $20,000; but he was also insolvent. He owed the bank about $8,000 on his own note. He had persuaded his assistant cashier, as a favor to him, and without any consideration, to give his note for $5,000, and Stevens had indorsed and delivered it to the bank, by which it was carried as a part of its assets. He owed to other banks $5,000 on promissory notes, which he had signed, and had persuaded a friend to sign with him as an accommodation. For six years he had been the administrator of the estate of one Jarrett Young. As such administrator he had received at least $2,600, but he had never accounted for or paid over to the heirs of the estate any part of it. The widow had demanded an account of him in vain. One of the heirs had repeatedly demanded an account of him, and had asked to know where the money of the estate was, but Stevens had continually put him off. In the latter part of July he demanded the account again, and told Stevens that they must ask him to do something pretty soon, or they would have to commence proceedings to make him do so. The community in which Stevens lived was not aware of these facts. In that community he was respected and esteemed. He was a member of the Congregational Church, a member of the Modern Woodmen, and belonged to various other societies. His moral and financial reputation was yet good. He was between 40 and 50 years of age. He had a wife and two children, and was an affectionate husband and an indulgent father. He was attached to his family, and his domestic relations were agreeable. On Saturday, August 19, 1892, he took $60 in money and a draft on a Chicago bank

for $75 from his bank in Crete, gave his wife $15 and his servant $5, took two valises, one of which contained nothing but an overcoat, and went to Chicago.    He registered at an hotel in that city on Sunday morning, and visited the exposition grounds on that day.    He remained at this hotel until about 11 o'clock in the forenoon on Tuesday, August 22, 1892, when he paid his bill, took his valises, said that he was going to Milwaukee, but intended to stop at Racine on the way, and left.    A few moments later he met a friend in a ticket broker's office, where he asked for a ticket, and said he was going somewhere for a couple of days, then to Milwaukee, and then to his home.    None of his family, his friends, or his acquaintances have ever seen or heard from him since that moment, unless the witness Hamilton did.    He testified that he knew him well, and that he met, recognized, and conversed with him in San Francisco about September 5, 1893; but some of Hamilton's acquaintances testified that his reputation for veracity was bad in the community in which he had lived. Strenuous efforts were made by Mrs. Stevens and some of the citizens of Crete to find her husband.    His picture and a notice of his strange disappearance were published in the paper of the Modern Woodmen, which has a circulation of 150,000.    The police officers of Chicago searched the hotels of that city for a trace of him, and scattered 5,000 circulars containing descriptions of him over the United States and Canada.    Some of the daily papers of Chicago and Boston contained extended notices of his disappearance, but no further tidings of him or of his whereabouts were received.

Upon this state of facts, the court charged the jury at considerable length, and gave 14 requests for instructions that were submitted by counsel, either in the forms in which they were submitted or with modifications that suggested themselves to the court.    Exceptions were taken to many parts of the charge of the court.    Two of the requests given to which exceptions were taken were:    "(1) The jury is instructed that the death of an absent person may be presumed in less than seven years from the date of the last intelligence from him, from facts and circumstances other than those showing his exposure to danger which might probably result in his death.    (2) The jury is instructed that seven years is the period at which the presumption of continued life ceases.    But this period may be shortened by proof of such facts and circumstances connected with the person whose life is the subject of inquiry as, submitted to the test of reason and experience, would force the conviction of death within a shorter period."

It is a general rule that a state of facts once shown to exist is presumed to continue until a change, or facts and circumstances inconsistent with its continued existence, are proved.    A living man is presumed to continue to live until the contrary is shown or is presumed from the nature of the case.    All the authorities concur in the general proposition that the presumption of life continues seven years after the unexplained disappearance of a man under ordinary circumstances, from whom no tidings return to his friends or acquaintances, and that then the presumption of life ceases and the presumption of death arises.    These presump-

tions, however, are but rational inferences from the given state of facts, which so many courts have agreed that reasonable men, in the exercise of sound judgment, would naturally draw, that they have become rules of action and of decision. They are, after all, only presumptions of fact; and, when the state of facts from which they are drawn is modified, the presumptions or inferences drawn from it must and ought to change. It is conceded that when one who is last seen in a state of imminent peril, that might probably result in his death, is never again heard from, though diligent search for him is made, the inference of immediate death may justly be drawn. It goes without saying that if a guilty man, who has been indicted for a heinous crime, flees in the full vigor of health from impending disgrace and just punishment, and his friends and acquaintances hear from him no more, the inference of continued life after the expiration of seven years might well be drawn, and no presumption could arise from that state of facts that his life had ceased within that period. The various facts of numberless cases will range them between the extreme cases we have supposed. Two cases of disappearance in which the facts are exactly alike will probably never arise, and the strength of the presumption of life or death will never be the same in any two cases. The facts and circumstances surrounding each disappearance which tend to affect the inference of continued life or early death that the minds of reasonable men, anxious only to arrive at the truth, would draw, should be received in evidence in the trial of these cases; and then, guided by the established presumption that one who disappears under ordinary circumstances is presumed to live for seven years thereafter, the fact of continued life or previous death at the important date should be determined by the jury if there is sufficient evidence in the case to warrant a finding that the established presumption has been varied, and by the court if there is no such evidence. On the trial of this case there was no request for a peremptory instruction to the jury to find this important fact either way, and hence the question whether or not there was sufficient evidence in the case to warrant the finding of the death of the insured before the commencement of these actions is not presented for our consideration. That question was sent to the jury by common consent. Stevens disappeared on August 22, 1892. The actions were commenced on July 31, 1893. The established presumption of fact from the disappearance of an individual under ordinary circumstances, from whom his relatives and acquaintances have never afterwards heard, is that he continues to live for seven years after his disappearance. If this presumption was unaffected by countervailing facts, it would continue in the case at bar until August 22, 1899; but this presumption of fact is not conclusive. It may be overcome, not only when the testimony of those who saw the insured die or saw his body after his death is produced, or when he was last seen in a peril that might probably cause his death, but also when all the facts and circumstances of the case—the possible motives, if any, of the lost one to absent and conceal himself in view of approach-

ing failure, disgrace, or punishment, his possible motives, if any, for returning to his family and occupation, his attachments to the members of his family and his friends, his interest and prospects in his business or occupation, and the extent of the unavailing search that has been made for him—are such that they would take the case out of the category of an ordinary disappearance, and would lead the unprejudiced minds of reasonable men, exercising their best judgment, guided by the established rule that life is presumed to continue seven years after an unexplained disappearance, to the conviction that death had intervened at an earlier date. Davie v. Briggs, 97 U. S. 628, 634; Hyde Park v. Canton, 130 Mass. 505, 509; State v. Plym, 43 Minn. 385, 45 N. W. 848; Waite v. Coaracy (Minn.) 47 N. W. 537; Tisdale v. Insurance Co., 26 Iowa, 170, 176, 177, 28 Iowa, 12; Seeds v. Grand Lodge (Iowa) 61 N. W. 411; Cox v. Ellsworth, 18 Neb. 664, 26 N. W. 460; Hancock v. Insurance Co., 62 Mo. 26, 31; Newman v. Jenkins, 10 Pick. 515; Montgomery v. Bevans, 1 Sawy. 653, 666, Fed. Cas. No. 9,735; Ashbury v. Sanders, 8 Cal. 62, 64; Hall's Deposition, Fed. Cas. No. 5,924. The jury should have been instructed accordingly. If, under such instructions, they were convinced by a fair preponderance of the evidence, in view of the established presumption of life for seven years in ordinary cases of disappearance, that the insured died before the commencement of these suits, we are unwilling to hold that they might not lawfully find that fact, although there was no proof that the insured was last seen in the presence of an imminent peril, that might probably cause his death. The exceptions to these instructions cannot be sustained.

An exception was taken to the following portion of the charge: "The jury is instructed that when an honored and upright citizen, who through a long life has enjoyed the fullest confidence of all who knew him, prosperous in business, and successful in the accumulation of wealth, rich in the affection of wife and children, and attached to their society, contented in the enjoyment of his possessions, fond of the associations of his friends, with no habits or affections contrary to these traits of character, journeys from his home to a distant city, and is never afterwards heard of, then a strong, if not conclusive, presumption arises in favor of his death." This is a quotation from the opinion of the supreme court of Iowa in Tisdale v. Insurance Co., supra; and we do not call attention to it to criticise or dissent from it in a case to which it is applicable. But a banker over 40 years of age, whose capital has been impaired more than 75 per cent., whose bank is insolvent, who has been notified by the state authorities that his bank must close unless he restores its capital, and who has striven in vain to restore it, can hardly be called "prosperous in business." Such a banker, who has accumulated $20,000 worth of real estate in a small town, who owes $17,000 to banks, and who has received from an estate of which he is administrator $2,000 or $3,000 more, for which he has failed to account after repeated demands, cannot be deemed to be very successful in the accumulation of wealth. The

difficulty with this instruction is that it was not applicable to this case, and for that reason it ought not to have been given. An instruction upon an assumed state of facts, to which no evidence applies, tends to withdraw the attention of the jury from the issues actually involved, to mislead them to determine the case upon false issues, and thus to reach an erroneous result. Railroad Co. v. Houston, 95 U. S. 703; Railroad Co. v. Blessing, 14 C. C. A. 394, 67 Fed. 277, 281.

The plaintiffs in error excepted to the following portions of the charge. In opening his charge to the jury the court below said: "Wherever there are women or children connected with a case, I make it a rule to say as little as possible to the jury when the matter is finally submitted to them for their consideration, because I have frequently found that my sympathies would get the better of my judgment. So I have found it advisable, as a rule, to say as little as possible to the jury, so that they might take a full and fair view of the duties they are called upon to perform." At the close of his charge, the court below said: "Now, gentlemen of the jury, I try to close my eyes, as well as I can, to the fact that a woman and child have any interest whatever in the result of a controversy when it is brought into court. I cannot always do it. I don't suppose you can. It is not expected. If a man can do that, he is no better than a brute. He is as bad as the heathen is supposed to be, and worse than the horse thief is thought to be. If he could close his eyes to that fact, lose all sense of decency and self-respect, he would not be fit for a juror. But, so far as it is possible for you to do that, you do so, and decide the case precisely as you would if it was between man and man, or between a woman and a woman. Of course, neither one has any greater or more extensive rights than the other, but both must be tried according to the same rule; both must be adjudged by the same law. so far as it is possible for human ingenuity to do it. And what I have said to you in reference to myself I ask you to do on behalf of your own selves. Take the case, and decide it according to the testimony, and according to the weight of the testimony, as it has been presented to you for consideration, and then let your verdict speak for yourself." In our system of trial by jury, the province and duty of the presiding judge is to fix the attention of the jury upon the issues on trial, and upon the evidence that is material to their determination, to guard them against the consideration of irrelevant and incompetent testimony, and against the influence of sympathy, passion, or prejudice, and to secure a fair and impartial trial of the issues presented. The main issue which this jury was trying was whether or not the insured had died before these actions were commenced. The consideration of what party or parties would be benefited or damaged by the determination of that issue in one way or the other was utterly irrelevant to this question. It could not tend in any way to assist in correctly deciding it. It was worse than irrelevant and immaterial. It was positively pernicious. The natural and inevitable

effect of its consideration was to excite the sympathies and to warp the judgment of the jurors, as it evidently did those of the. judge; and to produce a decision founded, not upon the evidence as to the life or death of the insured, but upon a consideration of the question whether or not the insurance companies could afford to lose the amounts of these policies better than the woman and child could afford to do without them. The charge of the court was an open invitation to the jury to substitute the latter question for the former, and to permit its determination to control their verdict. It not only invited but it taught them so to do, both by precept and example, for the judge himself devoted this· very forcible portion of his charge to the consideration of this very question. The. influence of the presiding judge in a jury trial can hardly be overestimated. His learning, his ability, his long experience in the trial of causes, and the rule that his view of the law must control, combine to command for him the respect of the jury, and to enable him often, by a word· or a look, to lead them to a decision of a doubtful case. Juries are none too anxious to divest themselves of passion, prejudice, and sympathy, and courts cannot be too diligent in guarding themselves and their juries against their influence. The portion of the charge under consideration is its own condemnation. Nothing that we can say will make its fatal error more glaring and apparent than its perusal.

There were two manifest errors in the admission of testimony in these cases. One was the receipt of a copy of a judgment of a state court of California certified by the clerk alone, without the certificate of a judge, chief justice, or presiding magistrate that the attestation was in due form of law. Rev. St. § 905; Code Civ. Proc. Neb. § 414; U. S. v. Biebusch, 1 Fed. 213, 215. The other was the admission of the testimony of Mrs. Stevens as to certain statements made to her· by Mrs. Young in a conversation relative to the account of Stevens with the estate of Jarrett Young. This testimony was mere hearsay.

The judgments below must be reversed, with costs, and the cases remanded, with directions to grant new trials; and it is so ordered.