Argued November 23, 1943; affirmed January 11; rehearing denied
February 8, 1944

# HEFFORD *v.* METROPOLITAN LIFE
# INSURANCE CO.

(144 P. (2d) 695)

Before BAILEY, Chief Justice, and ROSSMAN, KELLY, LUSK, BRAND and HAY, Associate Justices.

*Robert R. Rankin,* of Portland, for appellant.

*Abraham Asher* and *Maurice D. Sussman,* both of Portland, for respondent.

LUSK, J.   As an employee of Frank Chevrolet Company in Portland Leo P. Hefford was insured in the sum of $2,000.00 under a group policy of life insurance issued by the defendant Metropolitan Life Insurance Company.  His wife, the plaintiff Ethel I. Hefford, was named as beneficiary.  By the terms of the policy the insurance was collectible only if death occurred while Hefford was in the employ of Frank Chevrolet Company or within thirty-one days after

termination of such employment. On November 9, 1933, Hefford disappeared under circumstances shortly to be detailed and has not since been seen or heard from. His employment terminated on November 8, 1933, the day before he disappeared, and the insurance was in full force and effect on that date, and so remained for thirty-one days thereafter. In September, 1941, Mrs. Hefford commenced this action to recover the amount of the policy, alleging that Hefford was dead and that his death occurred within thirty-one days after the termination of his employment. A jury trial resulted in a verdict for the plaintiff, and from the consequent judgment the defendant has appealed.

Since the principal question for our determination is upon the sufficiency of the evidence—raised at the trial by appropriate motion for a nonsuit—a statement of the material facts becomes necessary.

At the time of his disappearance Hefford was forty-three years of age. He was by occupation an automobile mechanic, and was then earning about $135.00 or $140.00 a month. He was in normal health. He and Mrs. Hefford, the plaintiff, were married in 1914 and had a son, Franklin, who was seventeen years of age in 1933. He had been married once before. They had formerly lived in Montana, and came to Oregon in 1923, and ever since then he had pursued his occupation of a garage mechanic—most of the time in Portland. His employment with Frank Chevrolet Company commenced in 1928, and continued until the day of his disappearance. He was an industrious, steady worker, and liked by his fellow employees. He was blind in one eye as the result of an injury sustained at his work a number of years before.

There is a good deal of testimony, coming from his wife, his son, and his close friends, tending to make a picture of a kind and thoughtful husband and a contented and harmonious home. There are frequent references to Hefford's drinking, as frequent denials that he was ever intoxicated, and much positive swearing on the part of all concerned, including Mrs. Hefford, that his indulgences (whatever may have been their extent) were never a cause of complaint on her part. It was shown, by what seems to be credible evidence, that drinking never interfered with Hefford's work, and, while he had no bank account and had not saved any money, he left behind him no debts of great consequence.

On the morning of November 8, 1933, Hefford departed from his home in his automobile to go to work. He was dressed in his working clothes. His wife kissed him goodbye and asked him to bring home some groceries. He went to the Frank Chevrolet Company and was there on the job until about four or half past four in the afternoon. His fellow employees noticed nothing unusual about his actions or appearance. Sometime after leaving his place of work he applied to a loan company for a loan of $15.00, and the money was advanced to him with an offer to let him have more if he desired it. He did not draw two days' wages owing to him by his employer. About one o'clock of the morning of November 9th he arrived in a taxicab at the home of a man named Guy M. Rader, who lived at 4409 S. E. 89th Street. Hefford was intoxicated. The record does not use that word; it is our interpretation of Rader's testimony that "Hefford was plenty full of liquor". Rader had seen Hefford under the influence of liquor before and guessed that he "drank

whisky, mostly''. Hefford had at one time worked for Rader at the latter's garage, and they were friends. He explained to Rader that his car was ''stuck over town'' and prevailed upon Rader to assist him. It was a night of dense fog. Together they drove in Rader's car to the east approach to the Ross Island bridge, which spans the Willamette River at a point about four to four and one-half miles distant from Rader's home, where Hefford got out to look for his car, but soon returned saying that this was not the right place. He then showed Rader a slip of paper on which was written the address of the place from which he had phoned for the taxicab before going to Rader's house—a restaurant called ''Mac's Broiler'', located near the west approach to the Ross Island bridge—and they thereupon proceeded across the bridge to a place in the vicinity of ''Mac's Broiler'', where they stopped and Hefford got out of the car ''and started at a little trot up the street''. Rader followed him in the car, and Hefford, discovering this, stopped and told Rader to keep the car there, that he wanted to know where it would be when he came back. Rader complied, and watched Hefford as he started off again. He testified:

> ''I pulled up so I could look right down the sidewalk and I seen him until he went under the arc light, and the minute he stepped on the curb on the other side he just faded out of the picture and I couldn't see any more of him and I didn't see any more of him.''

That was the last time that Hefford was seen by any one who testified in this case.

It was then about two o'clock. Rader waited in his car for Hefford until about four-thirty, and then went

to a gasoline service station on the corner and asked the attendant if he had seen Hefford, and the attendant said he had seen him earlier in the evening when Hefford had asked for help in getting his car out of the mud. Thereupon Rader began searching the streets, and finally found Hefford's car stalled in the mud in a fill not far from where Hefford had left him. The car was not damaged but Rader was unable to remove it. He then drove to the Hefford home thinking that he might find Hefford there. He learned from Mrs. Hefford that her husband had not been home since leaving for work in the morning, and told her of his own experience with the missing man.

On cross-examination Rader gave the following testimony:

"Q Did he ever make any statements to you about his wife objecting to his drinking?

"A Nothing that I remember about.

"Q Did he ever tell you that his wife did object?

"A I don't remember of anything said like that now.

"Q Did he ever say anything about having trouble with his wife?

"A He didn't say whether it was his wife or what it was about. That night we went down there he tried to tell me something.

"Q What did he say?

"A He said something about he didn't know whether it was worth it or not, he told me that two or three times, and I was afraid that he was going to get on something I didn't want to hear, and I told him to shut up, I didn't want to hear it."

On November 9th Mrs. Hefford went to the Frank Chevrolet Company and learned there, on inquiry, that

nothing had been seen of her husband since the day before. She then reported his disappearance to the Multnomah County sheriff's office and to the Missing Persons Bureau of the Portland Police Department, giving a description of her husband which was published in the Police Bulletin of November 10, 1933, and was twice broadcast over a Portland radio station on November 10th. Copies of the bulletin, it may be inferred from the evidence, were distributed in accordance with the usual practice to law enforcing officers of the states west of the Rocky Mountains and of Vancouver and Victoria, British Columbia. Mrs. Hefford also made inquiry concerning her husband at "Mac's Broiler", and inspected the place where his automobile had been stalled. (Rader in the meantime had removed the automobile, which revealed nothing that would throw light on Hefford's disappearance save that in it were found the groceries which Mrs. Hefford had asked him to bring home and a copy of a magazine which he was accustomed to buy.)

Thereafter Mrs. Hefford, several times a week for several weeks, inquired concerning her husband of Officer Mallett, who was in charge of the Missing Persons Bureau, and she also sought the assistance of Captain Circle and Detective Thatcher of the Portland police force in locating the missing man. She also requested Mallett to have the Willamette River dragged for her husband's body, but was given to understand that this would not be done.

It appears from the record that Hefford had a sister, Mrs. Alice Jamieson, living in Seattle, Washington; another sister, Mrs. Ethel M. Palmer, living in Littleton, Colorado; a father living in Montana; an aunt living in England; and a great aunt living in

Australia. Shortly after Hefford's disappearance Mrs. Hefford wrote Mrs. Jamieson informing her of her husband's disappearance and asking her if she could throw any light on it. Mrs. Hefford did not communicate with any of the other relatives. She explained that Mrs. Jamieson was the only relative with whom Hefford had kept in touch and that she was not on friendly terms with Mrs. Palmer and had never corresponded with her, and that she did not know that Hefford's father was alive. Mrs. Palmer testified by deposition that she was "closely associated in the family" until 1907, and that she had not heard from her brother since 1927, when she was visiting in Portland and talked to him on the telephone. She further testified that she did not think Hefford was happy in his home life, but that the differences between him and his wife were trivial. So far as shown Mrs. Hefford had never heard of the aunt in England or the great aunt in Australia. Mrs. Jamieson wrote to Mrs. Palmer and informed her of Hefford's disappearance, but this was not until sometime in the year 1934.

Mrs. Hefford also wrote about the matter to her sister in Oilmont, Montana, where the Heffords had formerly resided.

On November 14, 1933, Frank Chevrolet Company notified the defendant of Hefford's disappearance.

The foregoing is the substance of the evidence upon which the court below, over the defendant's objection, submitted to the jury the question whether Leo P. Hefford was dead and had come to his death within thirty-one days after the termination of his employment.

The defendant contends that this was error, because, in its view, the evidence is too speculative to

support a finding of death at any particular time, especially in that it fails to disclose that the missing man was exposed to a specific peril at or about the time of his disappearance and does not measure up to the requirement of diligent search established by this and other courts in a case of this character.

■ According to the weight of authority, followed by this court in the case of *Arden v. United Artisans,* 124 Or. 225, 264 P. 373, exposure to imminent peril in a disappearance case is not an indispensable requisite of proof that a person who has been absent without tidings for more than seven years died at or about the time of his disappearance. The only other Oregon case on the subject is *Fink v. Prudential Insurance Company,* 162 Or. 37, 90 P. (2d) 762, which does not depart from, nor disapprove, the rule of the Arden case. It is true that in the Fink case a judgment for the plaintiff was reversed because evidence of diligent search for the absent person was lacking, and also because the nonreceipt of tidings could be reasonably explained without resorting to the conclusion that the absent man had died. But nothing in the decision warrants the view that this court has adopted the so-called specific peril doctrine.

Nevertheless, counsel for the defendant urges us to overrule the Arden case as bad law, and in support of this insistence offers the gratuitous information that the missing Arden of that case, like his more celebrated namesake Enoch, of Tennyson's poem, appeared in the flesh after he had been adjudged dead. This fact, if it be such, is said to demonstrate the speculative character of the evidence upon which juries are permitted to find that a missing person died at or about the time of his disappearance and before the presumption of

death from seven years unexplained absence has arisen: § 2-407 (26), O. C. L. A. But we think that it would go no further than to attest the fallibility of juries, as of all other human institutions. It would not be the first instance of a jury's mistake. Innocent men have been convicted and guilty men acquitted; malingerers awarded large damages and plaintiffs with meritorious claims turned out of court without a penny; but we do not, on account of such occasional miscarriages of justice, abolish the jury system or change the rules of law.

■ It is seldom possible in controversies which reach the courts to determine truth with absolute certainty. Of necessity we resort to the rule of probabilities. And so, in a disappearance case, the majority of the courts adhere to the view, to which this court is committed, that the circumstances connected with the unexplained long-continued absence of a person from his home may be such as to justify the belief that it is improbable that he basely deserted his family and surrendered all the things which normal men count of value in life, and probable that, had he not died at or about the time of his disappearance, he would have been heard from.

The leading case is *Tisdale v. Connecticut Mutual Life Ins. Co.*, 26 Iowa, 170, 96 Am. Dec. 136, and the oft-quoted language of that opinion is worth repeating here:

"An honored and upright citizen, who, through a long life, has enjoyed the fullest confidence of all who knew him,—prosperous in business and successful in the accumulation of wealth; rich in the affection of wife and children, and attached to their society; contented in the enjoyment of his possessions, fond of the associations of his friends, and

having that love of country which all good men possess, with no habits or affections contrary to these traits of character,—journeys from his home to a distant city and is never afterward heard of. Must seven years pass, or must it be shown that he was last seen or heard of in peril, before his death can be presumed? No greater wrong could be done to the character of the man than to account for his absence, even after the lapse of a few short months, upon the ground of a wanton abandonment of his family and friends. He could have lived a good and useful life to but little purpose if those who knew him could even entertain such a suspicion. The reasons that the evidence above mentioned raises a presumption of death are obvious; absence from any other cause, being without motive and inconsistent with the very nature of the person, is improbable. It is suggested in argument that such absence may be on account of insanity. That may be possible, but as death under such circumstances is more probable than insanity in the absence of evidence thereof, the law raises the presumption of death. Evidence which would point toward insanity as the cause of such absence would, of course, be proper for the consideration of the jury, from which its probability might be determined. The competency of evidence of the character above indicated, from which the fact of the death of an absent person may be found within the period of seven years, is well sustained by authority: 2 Greenl. Ev., sec. 278; Angell on Fire and Life Insurance, sec. 351; Doe v. Flanagan, 1 Ga. 543; White v. Mann, 26 Me. 376; Smith v. Knowlton, 11 N. H. 197."

Accordingly, it is quite generally, and we think properly, held, although there are authorities to the contrary, that "The death of an absent person before the expiration of seven years may be presumed or inferred from circumstances other than exposure to a probably fatal danger, where such circumstances show

an improbability of, or lack of motive for, a mere abandonment of his home": 16 Am. Jur., 31 § 36. See, 17 C. J., Death 1169, § 7; *Arden v. United Artisans,* supra; *Fidelity Mutual Life Ass'n v. Mettler,* 185 U. S. 308, 46 L. Ed. 922, 22 S. Ct. 662; *Schell v. Metropolitan Life Ins. Co.,* (Mo. App.) 3 S. W. (2d) 269; *Sackett v. Metropolitan Life Ins. Co.,* 260 Mich. 466, 245 N. W. 499; *Griffin v. Northwestern Mutual Life Ins. Co.,* 250 Mich. 185, 229 N. W. 509; *Sovereign Camp W. O. W. v. Boden,* 117 Tex. 229, 1 S. W. (2d) 256, 61 A. L. R. 682; *Howard v. Equitable Life Assurance Society,* 197 Wash. 230, 85 P. (2d) 253, 119 A. L. R. 1302; *Kansas City Life Insurance Co. v. Marshall,* 84 Colo. 71, 268 P. 529, 61 A. L. R. 1321; *Northwestern Mutual Life Ins. Co. v. Stevens,* 71 Fed. 258; cases listed in 34 A. L. R. 1390.

■ It is obvious, as stated by the editor of the annotation in 75 A. L. R. 637, that with regard to the sufficiency of the evidence each case must stand on its own facts. As Judge Sanborn said in *Northwestern Mutual Life Ins. Co. v. Stevens,* supra, "Two cases of disappearance in which the facts are exactly alike will probably never arise, and the strength of the presumption of life or death will never be the same in any two cases." "General rules as to the weight of evidence, which have not crystallized in established presumptions, are of no great assistance": *English v. United States,* 25 Fed. (2d) (D. C.) 335.

It could be found from the evidence in the instant case that Hefford's home was a normally happy one. Whether the domestic situation was truthfully and accurately portrayed by the witnesses, it is not for us to say—of that the jury were the judges. With respect to the evidence of Hefford's addiction to drink, one might argue that "the lady doth protest too much",

and that in the dying days of the Eighteenth Amendment and the nadir of the Great Depression, it would be a wife of uncommonly charitable nature and powers of self-restraint who would look on with complacency while her husband used a part of a modest wage, such as Hefford was receiving, for home brew and the other noxious products of that era. But that, too, was for the jury.

We doubt that any one hearing or reading the testimony would say that the Hefford home was idyllic, or that Hefford himself measured up in all particulars to the classic description of the missing man in *Tisdale v. Connecticut Mutual Life Ins. Co.*, supra. On the other hand, he was not facing "a somewhat protracted residence in the penitentiary" like the missing man in *Goodier v. Mutual Life Ins. Co.*, 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383, nor was he "heavily indebted", *Arnall v. Union Central Life Ins. Co.*, 157 Kan. 535, 142 P. (2d) 838. Unlike these and other cases cited by the defendant, the record here does not contain uncontradicted evidence of a motive which might have influenced Hefford to leave home voluntarily. There is nothing to justify a belief that he was a man of bad character or vicious propensities. A finding would be supported that he was a good father and a faithful husband. One might not be far wrong in saying that for those times here was an average family of its class, in not too prosperous circumstances, perhaps, but a family and a home, nevertheless, which the husband and father had no compelling reason to abandon and leave to their own resources.

Consider, too, the circumstances of Hefford's disappearance: If he intended to desert his family, when did he come to that decision? He went to work in the

normal fashion, and had no clothes with him other than the working clothes which he wore, and no baggage. He bought the groceries which his wife asked him to bring home. He had a small sum as wages coming to him from his employer, but did not draw it down. He borrowed $15.00 but refused a larger loan which he might have had. Very likely he used part of the money for intoxicants. He could hardly have gotten it to pay the expenses of an extended journey, and, had that been his purpose, it is not probable that he would have refused the larger loan. His conduct in the early hours of the morning, so far as it is known, was abnormal, no doubt due to intoxication. It could be said that a sober man, or one exercising ordinarily good judgment, and especially a man in Hefford's financial condition, would not have hired a taxicab to take him four or four and one-half miles to the home of a friend, whom he roused from his slumbers and induced to come to his assistance in rescuing his automobile stalled in the mud some five miles distant. Most men, we suppose, would have had the taxicab take them home. His statement to Rader about some trouble that he was having indicated a disturbed state of mind, the cause of which can only be conjectured. It could scarcely be argued that when he left the automobile to go in search of his car, and admonished Rader not to follow him, he had then made up his mind to abandon his wife and son. That would also seem to have been the act of an intoxicated man. It is certainly difficult to believe that his purpose in bringing Rader to the scene was to vanish in the fog before the eyes of his friend. It would seem much more reasonable to conclude that he had a fixed purpose to get his car out of the mud and drive it home. He lived ten miles from his place of work, was accustomed to driving to work in his automobile, and his

need for the car may have been the thing uppermost in his mind.

We are not determining the facts, but merely pointing to legitimate inferences that might be drawn from the evidence. And we think that if the jury had found, as it had the right to do, that Hefford was a good husband and father, that his home life was not unhappy, and that up to the very moment that he vanished he had given no indication of an intention to abandon his home, his employment and his friends, but every indication of a contrary purpose, then, considering the motives which ordinarily govern human conduct, the jury, in the exercise of a rational judgment, would have been warranted in the conclusion that the more reasonable explanation of Hefford's disappearance was that he met a sudden, untimely and mysterious death, rather than that he deserted his family.

But, as stated, the defendant argues that in order to support a finding of death it must have appeared that diligent, unavailing search for the missing man has been made, and that the evidence of search in the instant case is deficient. *Fink v. Prudential Insurance Company*, supra, is said to compel that conclusion. The evidence of search in that case was deemed insufficient, but the facts bear no resemblance to those with which we are here dealing. In the Fink case the court was able to say, as a matter of law, that "the evidence does not indicate that theirs was a happy home" (162 Or. 66): after Fink's disappearance his wife reported the occurrence to the police with the statement that "there was another woman in the case"; a few months later she complained to the district attorney that Fink had deserted her and her six children, and swore to an information charging him with the crime of nonsupport; and some four years later she filed suit for divorce, charg-

ing her husband with desertion. Numerous obvious sources of possible information as to the whereabouts of the missing man were ignored, among which the opinion calls particular attention to the fact that although Mrs. Fink had been reliably informed that Fink, on the day of his disappearance, left Portland, his place of residence, on an east-bound train, no inquiry was made of the railroad officials or the members of the train crew. "No reasonable mind, in our opinion," it was said, "would say that this inquiry should have been neglected" (162 Or. 88).

■ Search as an element of the plaintiff's proof is not universally required in this type of case. But in those jurisdictions where, as in Oregon, it is deemed indispensable, the rule upon the subject which seems to have been adopted by most of the courts and to which we give our approval is, as stated in *Modern Woodmen of America v. Michelin*, 101 Okla. 217, 225 P. 163, 36 A. L. R. 971:

"In our opinion, the party upon whom devolves the duty to make inquiry concerning the missing one is required to make only such search and inquiry at such places and sources of information and from such persons as a reasonably prudent person under the same or similar circumstances would deem to be sufficient under the terms of the rule as stated. Under proper instructions, the sufficiency of the search and inquiry is one for the jury, upon consideration of the evidence, and the jury's determination that same was sufficient will not be disturbed by this court on appeal, unless, from an examination and consideration of all the evidence in the record, we can say, as a matter of law, that the minds of all reasonable men should concur in holding same insufficient under the rule announced."

See, to the same effect, *Modern Woodmen of America v. White*, 70 Colo. 207, 199 P. 965, 17 A. L. R.

393; *Boynton v. Modern Woodmen of America*, 148 Minn. 150, 181 N. W. 327, 17 A. L. R. 401; *McAdoo v. Metropolitan Life Ins. Co.*, 233 Mo. App. 900, 110 S. W. (2d) 845; *Sackett v. Metropolitan Life Ins. Co.*, supra; 16 Am. Jur., Death 28, § 33; 25 C. J. S., Death 1059, § 6; 17 C. J., Death 1171, § 11.

■ The question of the sufficiency of the search made by Mrs. Hefford was submitted to the jury by the trial judge in a proper instruction. This in our opinion, was not error, for, under the evidence which has been summarized, whether reasonable diligence in this regard was exercised by the plaintiff was clearly not a question of law for the court, but of fact for the jury. Another person with ample funds to defray the expenses of advertising, the hiring of detectives, etc., might well have been expected to have done more. But Mrs. Hefford's practically penniless condition was a circumstance which the jury had the right to consider in determining what reasonably was required of her. *Fink v. Prudential Insurance Company*, supra (162 Or. 87). Her failure to communicate with Mrs. Palmer, Hefford's sister in Colorado, is particularly stressed by counsel for the defendant, but she might well have deemed that a useless act in view of the many years during which there had been no communication between Hefford and Mrs. Palmer. As the event proved, it would have accomplished nothing because Mrs. Palmer had no word of her brother after his disappearance. Obviously the plaintiff is not to be held lacking in vigilance because she failed to make inquiry of relatives of whom she had never heard or of the missing man's father whom she thought to be dead.

■ Upon the whole evidence we think that the jury was warranted in concluding, as it must have done, that

Mrs. Hefford exercised reasonable diligence in the circumstances to find or get word of her missing husband. That is a conclusion which this court has no authority to disturb, and the court below was right in denying the motion for a nonsuit based on the ground that the evidence of diligent search was insufficient.

The court instructed the jury in substance that it was not necessary for the plaintiff to prove the death of Hefford by direct evidence, but that she might prove it by circumstantial evidence and reliance upon the presumption of death from seven years' absence; that this presumption does not fix the time of death as the first day or the last day or any other day of the seven-year period, but the date of death was for the determination of the jury from the evidence; and that if the jury found from a preponderance of the evidence, taking into consideration, among the other facts and circumstances, the absence of Hefford from his home without tidings for a period of more than nine years, that Hefford died within thirty-one days after his employment terminated, it should return a verdict for the plaintiff.

Exceptions to these instructions, taken by the defendant, as well as to the court's refusal to give an instruction requested by the defendant, raise the question whether the presumption of death from seven years' absence is a relevant factor in a case where it is claimed that the insured died before expiration of the seven-year period. There are cases which hold that it is not relevant, one of the most recent being *Tyrrell v. Prudential Ins. Co.*, 109 Vt. 6, 192 Atl. 184, 115 A. L. R. 392. The court's reasoning was to the effect that there is a presumption of life for seven years, at the end of which time the presumption of death takes its place; and, since that presumption does not act retro-

actively, there is no rational connection between the fact presumed and the fact to be proved. It was said:

"Proof that one is alive on a certain day is, standing alone, enough to warrant an inference that he was alive on the following day. But proof that one was dead on a certain day is not, standing alone, enough to warrant an inference that he was dead on a previous day."

■ The weight of authority, both in this country and in England, is that the presumption from seven years' absence is of death alone and not of the time of death. The presumption of death arises at the end of seven years, but by this it is not meant that death is presumed to have occurred at that time, but on some day within the seven-year period. According to the leading English case of *Nepean v. Knight,* 2 M. & W. 894, the probabilities are that the death took place a considerable time before expiration of the seven-year period. In that case Lord Denman, C. J., said at p. 913 of the report:

"Now, when nothing is heard of a person for seven years, it is obviously a matter of complete uncertainty at what point of time in those seven years he died; of all the points of time the last day is the most improbable, and most inconsistent with the ground of presuming the fact of death. That presumption arises from the great lapse of time since the party has been heard of, because it is considered extraordinary, if he was alive, that he should not be heard of. In other words, it is presumed that his not being heard of has been occasioned by his death, which presumption arises from the considerable time that has elapsed. If you assume that he was alive on the last day but one of the seven years, then there is nothing extraordinary in his not having been heard of on the last day; and the previous extraordinary lapse of time during which he was not heard of has become immaterial

by reason of the assumption that he was living so lately. The presumption of the fact of death seems, therefore, to lead to the conclusion that the death took place some considerable time before the expiration of the seven years.''

The rule is thus stated in 1 Jones, Commentaries on Evidence (2d Ed.) 480, § 291:

"In some of the cases the view is maintained that, if no sufficient facts are shown from which to draw a reasonable inference that death occurred before the lapse of seven years, the person is deemed in all legal proceedings to have lived during that period and to have died at its expiration; that the presumption of death which arises at the end of the seven years cannot act retrospectively and that to this extent the time as well as the fact of the death are to be presumed. But by the weight of authority, the presumption is only that the person is dead at the expiration of seven years, not that the death occurred at the end of that time or at any other particular time within that period. This is left to be determined as a matter of fact, according to the circumstances which may tend to satisfy the mind that it was an earlier or later day. 'Therefore, if anyone has to establish the precise period during those seven years at which such person died, he must do so by evidence, and can neither rely, on the one hand, on the presumption of death, nor, on the other, upon the presumption of the continuance of life.' This reads, to-day, as sound law as the day it was written."

The matter quoted in the foregoing text is from 1 Taylor on Evidence, § 157. Among other authorities supporting this view are the following: *Arden v. United Artisans*, supra; *Davie v. Briggs*, 97 U. S. 628, 24 L. Ed. 1086; *Kansas City Life Ins. Co. v. Marshall*, 84 Colo. 71, 268 P. 529, 61 A. L. R. 1321; *Rhodes v. Rhodes*,

Law Rep. 36 Ch. 586 (1887); *In re Lewes' Trusts,* Law Rep. 11 Eq. 236 (1870-71); *Lal Chand Marwari v. Mahant Ramrup Gir,* 42 T. L. R. 159 (1925-26); 17 C. J., Death 1174, § 18; 25 C. J. S., Death 1063, § 8.

■ But, although the time of death must be established by distinct proof, it does not follow that the presumption of death from seven years' absence is not relevant to the issue, for, once the fact of death within the seven-year period has been established, the plaintiff has made considerable progress towards his goal, which is reached when he has produced evidence of facts and circumstances from which an unprejudiced mind may draw the rational conclusion that death occurred at a time within the life of the policy before the seven years had expired. If there were no statutory or common law presumption on the subject we think it would undoubtedly be held that unexplained absence for that period of time might well give rise to an inference of death proper for the consideration of the jury. Why, then, should the jury not be permitted to consider the same fact as it has been crystallized into a presumption of law?

We are unable to agree with the view of this question taken in *Tyrrell v. Prudential Ins. Co.,* supra, and think it is not supported by the weight of authority. In numerous cases the question has arisen upon the contention of the insurance company, that the action was barred by the statute of limitations, and the courts have held that the cause of action did not accrue and the statute, therefore, did not commence to run until the lapse of seven years from the time of disappearance, for the reason that "there were not sufficient facts presented to prove the death of the insured without the aid of the presumption arising after the expiration of

seven years' absence'': *Howard v. Equitable Life Assurance Society,* 197 Wash. 230, 236.

In *Griffin v. Northwestern Mutual Life Ins. Co.,* 250 Mich. 185, 194, the court said:

"On this record the insured is dead. New York Life Ins. Co. v. Brame, 112 Miss. 828 (73 South. 806, L. R. A. 1918B, 86). He was living on December 30, 1915, and seven years later was dead. Plaintiff, in her effort to fix, within that period, a time of death, has the benefit, given by the law, of the presumption of death, and on this record the established fact of death. If she were called upon to prove unaided by the presumption both the fact and the time of death her task would be difficult indeed. But given the fact of death, and that it occurred within a certain period of time, she has the comparatively lighter task of fixing merely the time of death."

Again in *United States v. O'Brien,* 51 Fed. (2d) 37 (C. C. A. 4th), the court said:

"Manifestly if the petitioner was relying here solely upon the presumption of death, this would not constitute a sufficient showing as to the time of death to justify a jury in concluding that the death took place at any given date, but the presumption of death comes in here in aid of other substantial evidence that Cartier is dead."

To the same effect are: *Behlmer v. Grand Lodge A. O. U. W.,* 109 Minn. 305, 123 N. W. 1071, 1073, 26 L. R. A. (N. S.) 305; *Sovereign Camp W. O. W. v. Boden,* supra; *American Nat. Ins. Co. v. Hicks,* (Tex.) 35 S. W. (2d) 128, 75 A. L. R. 623; *Benjamin v. District Grand Lodge, I. O. B. B.,* 171 Cal. 260, 152 P. 731; *Gaffney v. Royal Neighbors,* 31 Idaho 549, 174 P. 1014; *Schell v. Metropolitan Life Ins. Co.,* supra; *Kansas*

*City Life Insurance Co. v. Marshall,* supra; *Sackett v. Metropolitan Life Ins. Co.,* supra; *Ballinger v. Conn. Mut. Ins. Co.,* 167 Tenn. 367, 69 S. W. (2d) 1090; *In re Christin's Estate,* 128 Cal. App. 625, 17 P. (2d) 1068. See annotation, 75 A. L. R. 636.

▰ Similarly, because of the effect given to the presumption, it is held that, notwithstanding a provision in the policy limiting the time within which formal proof of death must be presented to the insurance company, it will suffice in a disappearance case to present such proof within a reasonable time after the presumption of the death of the insured from seven years' absence has arisen. 7 Cooley, Briefs on Insurance 5913; 3 Appleman, Insurance Law & Practice 29, § 1413; 7 Couch, Cyclopedia of Insurance Law 5445, § 1538.

▰ Upon this point we might well rest our decision on the Arden case, which distinctly recognizes that the presumption of death from seven years' absence is a relevant factor in this character of litigation (see 124 Or. 233); but, in view of the criticism of that case by counsel for the defendant, and since the court refrained from citation of authorities to support its reasoning, we have deemed it fitting to set forth the results of our investigation of the state of the law in other jurisdictions. We are of the opinion that the Arden case upon this question accords with the weight of authority and the better reasoned decisions, and that the instructions complained of, which were fully warranted by this view of the law, were free from error.

The policy sued upon contains the following provision:

"Upon receipt by the Company of due notice and proof—in writing—of the death of any employee, while insured hereunder, and upon the sur-

render of the Certificate issued hereunder to such employee, the Company will pay, subject to the terms of said contract of insurance, to the beneficiary of record, the amount of life insurance then payable on account of such employee, according to a formula."

The plaintiff, in her complaint, alleged that the defendant had waived compliance with the foregoing requirements. The defendant, in its answer, alleged failure to make written proof of death in accordance with the provisions quoted, and also assigned such failure on the plaintiff's part as one of the grounds of the motion for a nonsuit. The court instructed the jury in effect that the proof established waiver as alleged by the plaintiff, and to this instruction the defendant excepted.

The evidence shows that on June 18, 1941, Mr. Abraham Asher, attorney for the plaintiff, addressed a letter to the defendant at its New York office advising the defendant that he had been retained by the plaintiff to collect the amount of the policy and further stating:

"We are informed by Mrs. Hefford that her husband disappeared on or about November, 1933, and has been missing ever since and his whereabouts are unknown, and under the assumption that one having disappeared and not being in existence for a period of seven years, is presumed to be dead.

"We are calling this to your attention and if there are any proofs of loss or further information you desire, we would be very glad to hear from you and cooperate in the hope that this matter can be adjusted."

After further correspondence, Mr. Asher, under date of July 28, 1941, adressed the following letter to the manager of the defendant's Portland office:

"Pursuant to our telephone conversation of recent date with respect to the above claim, be informed that our client and this office desires to cooperate to the fullest extent, but we feel that the matter should not be delayed unnecessarily, but should be disposed of in a reasonable time for if your company disclaims any liability, Mrs. Hefford is of the opinion that she will request that an action be filed.

"As related to you by our client, Mrs. Hefford, the entire matter of the disappearance was reported to the Portland Police Department who must naturally have a file. The insured was employed by the Frank Chevrolet Company for five or six years, and his disappearance was reported to Mr. Frank of the Frank Chevrolet Company. He was a mechanic doing body and fender work for this concern.

"During the married life of Mr. and Mrs. Hefford over a period of 19 years, there was no disruption of any kind or character, and their relations were of the best. At the time of the disappearance, the insured was of the age of 44 years and the beneficiary of the age of 39."

Under date of August 15, 1941, the manager of the defendant's claim division wrote Mr. Asher as follows:

"Your letter of July 28 addressed to Mr. I. E. Hervin, Manager of our Portland, Oregon, District, has been referred to this office.

"Leo Hefford last worked for the Frank Chevrolet Company on November 8, 1933. Because of his absence from work thereafter his employment was terminated and his insurance canceled as of November 30, 1933. In the absence of any proof of his death prior to the cancelation of the insurance, we cannot acknowledge any liability.

"Presumably, it is intended to assert claim on the basis of a presumptive death. At the time such presumption of death would arise there would be, of course, no insurance in force and we, therefore, would be obliged to decline liability.

"This letter is without prejudice to any of our rights or defenses in the event of litigation."

The governing principle is stated in *Schmurr v. State Insurance Co.*, 30 Or. 29, 32, 46 P. 363, and reaffirmed in *Fagerlie v. New York Life Ins. Co.*, 129 Or. 485, 496, 278 P. 104, as follows:

"The law is settled that where the assured, in attempting in good faith to comply with the provision of a policy, furnishes to the insuring company, within the time stipulated, what purports and is intended to be proof of loss, the company must point out particularly any defects therein if it intends to rely upon them. If it fails to do so, objection cannot thereafter be made to its sufficiency. * * * It is the duty of an insurance company, pending the adjustment of a loss, under its policy, to act toward the claimant in good faith, and if it is dissatisfied in any way with the proof furnished, it ought to make known to the assured the specific nature of its objections, so that he may have an opportunity to make the necessary correction before it is too late. Good faith and common honesty demand as much, and the law is not satisfied with anything less."

Counsel for the defendant concedes the soundness of this principle, but argues that the case does not fall within it because, it is said, the defendant did in fact point out with particularity the defect in the proof, namely that there was no proof of death. If the defendant had admitted the possibility of proving the death of the insured while the policy was in effect, by means of

the presumption arising from seven years unexplained absence in connection with the circumstances attendant upon the insured's disappearance, and had demanded or pointed to the lack of further particulars, such, for example, as the efforts made to locate the insured, or facts relating to his habits, financial condition and the like, there would be some merit in the defendant's suggestion. But nothing remotely resembling that course was taken by the defendant. It ignored the plaintiff's offer to furnish "any proof of loss or further information" to defendant, and denied liability on the ground that death had not occurred before the policy lapsed. It said to the plaintiff's attorney:

"In the absence of any proof of his death prior to the cancellation of the insurance, we cannot acknowledge any liability.

"Presumably, it is intended to assert claim on the basis of a presumptive death. At the time such presumption of death would arise there would be, of course, no insurance in force and we, therefore, would be obliged to decline liability."

It cannot be that the manager of the claim division of the Metropolitan Life Insurance Company had never before heard of a disappearance case or that he thought that his letter would be taken by Mr. Asher as an invitation to furnish a coroner's certificate of death or the affidavit of an eye witness that he had seen Hefford's corpse within thirty-one days after November 8, 1933. If that was in his mind, he knew that proof of that kind was impossible of production. His position was simply and clearly that, since the presumption of death did not arise until after the policy had expired, his company was not liable, and he so informed Mr. Asher in language which, in our opinion, is open to no other interpretation. Either the proof submitted was

sufficient to satisfy the policy or, if insufficient, further proof was waived by the defendant. It does not matter which. In either event, the trial judge correctly instructed the jury to disregard this defense and correctly ruled that it was not ground for a directed verdict. See, *Watson v. Pacific Mut. Life Ins. Co.*, 144 Or. 413, 21 P. (2d) 201, 25 P. (2d) 162; *Ringo v. Automobile Ins. Co.*, 143 Or. 420, 22 P. (2d) 887; *Meader v. Farmers' Mut. Fire Relief Ass'n.*, 137 Or. 111, 1 P. (2d) 138; *Hahn v. Guardian Assurance Co.*, 23 Or. 576, 32 P. 683, 37 Am. St. Rep. 709.

The identical question arose, though in a different way, in the case of *Tyrrell v. Prudential Insurance Co.*, supra. Two policies of insurance were involved, one of which lapsed after, and the other before, expiration of the seven year period. As to the latter, the court instructed the jury that if they found that the insured had died before the policy expired they should allow interest, and the jury having found for the plaintiff accordingly, the defendant, on appeal, contended that the instruction was erroneous because nothing was collectible under the policy until due proof of the death of the insured had been furnished, and a verdict of the jury would be the first due proof of that fact. The evidence showed that the plaintiff, some four years after the disappearance of the insured, who was her husband, had made out and sworn to and filed with the company on a blank furnished by the company, entitled "Claimant's Statement of Disappearance", her version of her husband's disappearance, and that subsequently, at the company's request, she answered certain questions about the case, and that no question was ever made by the defendant that she had withheld any information in her possession or that the proof of

death was in any way insufficient except, to quote from the opinion, "that it was not proof of Tyrrell's (the insured's) 'actual death' ". Thus, it appears that the defendant in that case made exactly the same contention that the defendant here is urging. The Vermont court said that under the law of Vermont, in the absence of a contract concerning it, interest does not begin to run until the defendant is shown to be in default, and that it therefore became necessary to determine when the cause of action arose on the policy. The opinion proceeds:

"The record shows that for practically four years, the company, with full knowledge that this was a disappearance case, and that the proof held by it was all the plaintiff, according to her claim, could tell them about Tyrrell's death, failed to question the sufficiency of the proof, except as stated.

"The purpose of a proof of death is to enable the insurer to form an intelligent estimate of its rights and liabilities under its policy. Griffin v. Northwestern Mut. Life Ins. Co., 250 Mich. 185, 229 N. W. 509, 510; Equitable Life Assur. Society v. Dorriety, 229 Ala. 352, 157 So. 59, 62. The requirement for such proof is inserted in the policy for the sole benefit of the company, and can be waived by it. Mosley v. Vt. Mut. F. Ins. Co., 55 Vt. 142, 147; Findeisen v. Metropole F. Ins. Co., 57 Vt. 520, 524; Grattan v. Metropolitan L. Ins. Co., 80 N. Y. 281, 36 Am. Rep. 617. Unless fixed by the policy, there is no precise standard to which the proof must conform. The policy in hand does not necessitate direct evidence of death, or proof of 'actual death', but only such evidence thereof as is reasonably available. The company must know that, in disappearance cases, the means of proof of death are necessarily limited. When, as here a bona fide attempt to comply with the requirement of the

policy has been made, simple fairness requires that the company should point out any defects therein if it would rely on them. Forman v. New York L. Ins. Co., 267 Mich. 426, 255 N. W. 222, 223; Fagerlie v. New York L. Ins. Co., 129 Or. 485, 278 P. 104. When such attempted proof is made out on a printed form furnished by the company, and is not objected to for want of definiteness or sufficiency, it should not lie in the mouth of the company to complain of such defects. Gardon v. New England Mut. L. Ins. Co., 218 Iowa, 1094, 254 N. W. 287, 289; Rinaldi v. Prudential Ins. Co., 118 Conn. 419, 172 A. 777, 780.

"We hold, therefore, that in the circumstances, this proof of death was sufficient in law, Griffin v. Northwestern Mut. L. Ins. Co., supra; that if it was not, the company had waived further proof, Grattan v. Metropolitan L. Ins. Co., supra; and that the company is not in a position to deny its sufficiency."

It would be difficult to add to the cogency of the foregoing reasoning. It conforms to the position taken by this court on like questions and to the decisions of the courts generally, and disposes of the assignment of error adversely to the defendant's contentions.

Counsel for the defendant says in his brief:

"A final reason why there is no waiver of proof of death in this case is contained in that portion of the policy that provides no payment shall be made under the provisions of the policy 'unless such notice and proof of such death * * * is submitted to the Company within ninety (90) days after the date of such death * * * .' "

We need not determine whether the courts would enforce such a provision in a disappearance case, for the reason that the clause from which the quoted language was extracted was not intended to, and does not, have any application to the case in hand. It should

first be observed that the provision concerning proof of loss which is set out at the beginning of this discussion is the only provision upon that subject pleaded in the defendant's answer or specified in its motion for a nonsuit, and that provision contains no time limit. The language now relied on is taken from a lengthy amendment to the policy made effective May 1, 1933, and is copied into the certificate issued to Hefford as an insured under such policy. This amendment is entitled "Extended Death Benefit", and provides in substance for the payment of certain life insurance to the beneficiary of an insured employee whose employment has terminated and whose death occurs within a specified period after such termination, and who was continuously and totally disabled from the time of termination of his employment to the date of his death. With respect to a situation of that kind it is provided "that no payment shall be made under the provisions of this section unless such notice and proof of such death *and of such disability* is submitted to the Company within ninety (90) days after the date of such death" (Italics supplied). The provision, on its face, is so utterly and patently foreign to the case with which we are dealing that we are unable to understand why counsel for defendant has seen fit to refer to it or to claim anything for it.

After a careful examination of the transcript of testimony and consideration of the contentions of counsel and the numerous authorities cited, we find no error in the record. The case was submitted to the jury by the trial judge in instructions which fully and accurately stated the principles of law which should

govern its decision, and the verdict was warranted by the evidence.

We allow the plaintiff the sum of $350.00 as a reasonable attorney's fee for the services rendered by her attorneys in this court: § 101-134, O. C. L. A.

The judgment is affirmed.